Barbara FOX, et al.

v.

**DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT, et al.**

Civ. A. No. 75–445.

United States District Court,
E. D. Pennsylvania.

Jan. 28, 1982.

Harold R. Berk, Alan Lerner, Philadelphia, Pa., for plaintiffs.

James G. Sheehan, Asst. U.S. Atty., Patricia Profit, Dept. of Housing & Urban Development, Philadelphia, Pa., for defendants.

## MEMORANDUM

NEWCOMER, District Judge.

Defendant Department of Housing and Urban Development ("HUD") moves for a stay pending appeal of this Court's Order of November 18, 1981, that HUD shall, among other things, make Government National Mortgage Association ("GNMA") funds available for the financing of a development project to be built in compliance with a consent decree approved by this Court.

After I entered the Order of November 18, 1981, HUD moved to amend the judgment, arguing for the first time that the anti-injunction language contained in 12 U.S.C. § 1723a(a) bars this Court from ordering the Secretary of HUD to make

GNMA financing available.[1] I denied HUD's motion to amend judgment on the basis of a waiver of that defense by the Secretary in his execution of the consent decree. After considering defendant's likelihood of prevailing on appeal and reconsidering the issue of waiver, I conclude that a waiver cannot be found in that transaction. Nevertheless, I will not vacate my order denying defendant's motion to amend judgment, because on the alternative grounds urged at that time the ruling was correct.

The statute cited by HUD in its motion to amend judgment and in its motion for a stay is an express waiver of sovereign immunity, which states that GNMA "shall have power ... to sue and to be sued, and to complain and to defend, in any court of competent jurisdiction, State or Federal," which includes an express limitation.[2] 12 U.S.C. § 1723a(a). The issue to be decided is whether by virtue of that limitation Congress has permitted the Secretary to be subject to an order regarding the allocation of GNMA funds.

Turning first to the language of the statute, it might seem that GNMA is permitted by statute to be sued for damages, but that injunctions may not be issued against it. The limitation on the waiver of sovereign immunity is, however, defined and it is not that broad. No "attachment, injunction, or other similar process ... shall be issued *against the property* of the Association or against the Association *with respect to its property.*" 12 U.S.C. § 1723a(a) (Emphasis added) Clearly, some kinds of injunctions can be entered against GNMA; only those entered against its property are impermissible. Thus, I must conclude that my learned brother Cahn's statement, "Sovereign immunity precludes an injunction against GNMA." *Crockett Mortgage Co. v. Government National Mortgage Ass'n.*, 418 F.Supp. 1081, 1083 (E.D.Pa.1976), is correct as a conclusion applicable to the facts of the case before him but cannot properly be broadly read as a general rule.

Because only injunctions against GNMA's property are forbidden, I must now decide what kinds of injunctions are meant by those two phrases, and whether the order I have entered falls within that definition.

The art of statutory construction has changed in recent decades from a mechanical application of the "plain meaning" of the words of a statute to a derivation of the legislative intent. Judge Aldisert has traced the history of this change, *United States v. Cerilli*, 603 F.2d 415, 429–30 (3d Cir. 1979) (Aldisert, J., dissenting), concluding that "the purpose, the subject matter, the context, and the legislative history appear to be the major aids in considering statutory precept today." *Cerilli* at 430. The word "property" is not defined in the GNMA statute. Neither is meaning of the word clear from the context of the sentence in which it is used. If Congress had meant to prevent all injunctions against GNMA it could have used language similar to the language it used in the Small Business Administration Act. 15 U.S.C. § 634(b)(1)[3]. It did not do so and the plain meaning of the language it chose is not clear, so I must derive Congress's intent in proscribing certain injunctions and permitting others.

Unfortunately, the legislative history of the 1954 amendments to the National Housing Act contains no articulation of Congress's purpose in adding the anti-injunction language of the Act. I am left then to consider the purpose, the subject matter, and the context of the statute as a whole. Congress declared its purposes in the statute itself.

The Congress declares that the purposes of this subchapter are to establish secondary market facilities for home mortgages, to provide that the operations thereof shall be financed by private capital to the

---

1. The statute states, in relevant part, "no attachment, injunction, or other similar process, mesne or final, shall be issued against the property of the Association or against the Association with respect to its property." 12 U.S.C. § 1723a.

2. *See supra* note 1.

3. *See infra* at 543.

maximum extent feasible, and to authorize such facilities to—

(a) provide supplementary assistance to the secondary market for home mortgages by providing a degree of liquidity for mortgage investments, thereby improving the distribution of investment capital available for home mortgage financing;

(b) provide special assistance (when, and to the extent that, the President has determined that it is in the public interest) for financing of (1) selected types of home mortgages (pending the establishment of their marketability) originated under special housing programs designed to provide housing of acceptable standards at full economic costs for segments of the national population which are unable to obtain adequate housing under established home financing programs, and (2) home mortgages generally as a means of retarding or stopping a decline in mortgage lending and home building activities which threatens materially the stability of a high level national economy; and

(c) manage and liquidate federally owned mortgage portfolios in an orderly manner, with a minimum of adverse effect upon the home mortgage market and minimum loss to the Federal Government.

12 U.S.C. § 1716. GNMA has been charged with the duty of carrying out the purposes contained in paragraphs (b) and (c). 12 U.S.C. §§ 1720, 1721. GNMA receives money in congressional appropriations, collections on loans, loans from the Treasury Department, sale of securities, and the issuance of trust certificates, but GNMA is designed to operate with the minimal cost to the United States[4], and all "benefits and burdens incident to the administration of the function and operations of the Association ... shall inure solely to the Secretary of the Treasury." 12 U.S.C. § 1722. GNMA's function can be analogized to arbitrage; it enters the market, buying mortgages from primary lenders, in order to stimulate the mortgage market, and then sells the mortgages. It is clear from the statutory scheme that Congress was interested in the promotion of the housing market, and that GNMA was intended to operate freely in that market. To that end, the anti-injunction clause forbids attachments, injunctions, "or other similar process." When considered in the light of GNMA's activities, which are in the purchase and sale of securities representing in some circumstances the credit of the United States or, in other cases, real property, the anti-injunction clauses take on a more restricted meaning. In particular, the initial use of the word "attachment" connotes execution of a lien; following in that vein, "injunction" must apply primarily to the "property" securing mortgage notes held by GNMA. And, indeed, that construction is wholly consistent with "the purpose, the subject matter, [and] the context," *United States v. Cerilli*, 603 F.2d 415, 430 (3rd Cir. 1979), of the GNMA statutes. It would cause no end of disturbances in GNMA's operation if the property underlying mortgages purchased by GNMA were subject to the liens and attachments, or injunctions, that are entered as a routine matter against ordinary debtors or litigants.[5] By contrast, no reason presents itself why GNMA should be exempt from injunctive orders with regard to its other attributes. Having reviewed the statute as a whole, I am convinced that the "property" referred to is the real property securing mortgages purchased by GNMA and conceivably, the mortgages themselves. I add this last phrase because the interpretation I have made of the statute does not limit the meaning of the word

---

**4.** *E.g.* 12 U.S.C. § 1720(b) ("The Association shall impose charges or fees for its services under this section with the objective that all costs and expenses of its operations under this section should be within its income derived from such operations and that such operations should be fully self supporting.")

**5.** *E.g. Bungar v. St. Michael's Greek Church*, 272 Pa. 402, 116 A. 389 (1922); 42 Pa.Con.Stat. Ann. § 3104(c) (Purdon) (Lis Pendens).

property to the real property securing the mortgage notes held by GNMA. It is clear from the statutory plan erected by Congress that GNMA requires a high degree of transferability in the mortgages that it acquires. Consistent with that rationale I conclude that the "property" referred to in 12 U.S.C. § 1723a(a) includes the mortgage notes acquired by GNMA.

HUD argues that language in the enabling legislation of the Small Business Administration ("SBA") almost identical to the language of 12 U.S.C. § 1723a(a) has been interpreted more broadly, and that the reasoning in those cases should be instructive here. 15 U.S.C. § 634(b)(1). *E.g. United States v. Mel's Lockers, Inc.*, 346 F.2d 168 (10th Cir. 1965). In fact, the language is significantly dissimilar. Where the GNMA statute says that injunctions shall not be entered against its property, or against it with regard to its property, the Small Business Administration Act states, "but no attachment, injunction, garnishment, or other similar process, mesne or final, shall be entered against the Administrator or his property." 15 U.S.C. § 634(b)(1). In contradistinction to the GNMA statute, no injunction may be entered against *either* the Administrator of the SBA *or* his property. The plain language of the GNMA statute permits an injunction against it; it is only injunctions against the Association "with respect to its property" that are forbidden.

█ The order entered by me requires the Secretary of HUD to exercise his discretionary power over the activities of GNMA. For the Secretary to comply, he would set aside the necessary funds,[6] commit them to the purchase of mortgages on properties developed by Wash West Properties, and ultimately, purchase those mortgages. Nothing in that chain of events is the "property" of GNMA until GNMA purchases the Wash West mortgages.[7] At that moment, those mortgages become immune, by the language of the statute, from an injunctive order.

Neither are the funds GNMA might use to purchase the mortgages in any sense its "property." Although GNMA is a corporation, without capital stock, 12 U.S.C. § 1717(a)(2)(A), it has no retained earnings or equity, and, as mentioned, any benefits inuring to it are paid to the Department of the Treasury. 12 U.S.C. § 1722. The comparison I made earlier between GNMA and an arbitrageur is apt; GNMA borrows money, uses it, and returns it when possible, after having affected the housing market as Congress intended. Where Congress has appropriated funds for this purpose, GNMA does not "own" the money, nor can it transfer the money to another entity except as Congress has prescribed. The sort of restricted interest GNMA has in congressional appropriations cannot be characterized as an interest in "property." *See Hamilton v. Rathbone*, 175 U.S. 414, 421, 20 S.Ct. 155, 158, 44 L.Ed. 219 (1899) (property is "everything one person can own and transfer to another"). Of course, GNMA does not have a true property interest, in that sense, in the mortgages it purchases or the land securing those mortgage notes. However, as I have explained, the use of the word "property" makes sense with regard to the statutory scheme if it is understood to include the mortgages and the real property. To include within the definition of property congressional appropriations, money borrowed from the treasury or the money markets, or, to suggest the absurd, office supplies and stationery, does not seem reasonable in light of the clearly-stated Congressional purposes.

This interpretation of the statute is not inconsistent with Judge Cahn's decision in *Crockett, supra*. In that case, GNMA already owned the mortgages in question, and plaintiff was a disappointed prospective purchaser. Had Judge Cahn issued the requested injunction in that case he would have entered an injunction with respect to mortgages held, at some point, by GNMA,

---

**6.** The Court has been informed that HUD has set aside the necessary funds.

**7.** HUD argues that this action "affects" the property of HUD. While this may be true, the statute speaks of an injunction *against* not *affecting* the property of the Association.

and the real property securing those mortgages. By my interpretation of the statute, as well as his, that would have been impermissible.

I note that the order I have entered in this case is not, by its terms, an injunction against GNMA. It is an order directed to the Secretary of HUD who agreed, when he executed the consent decree to use his "best efforts to obtain approvals necessary to effectuate the terms of this settlement from . . . any necessary federal agencies." (Consent Decree at ¶ 13). Although it is undisputed that the Secretary has the discretion and the power to direct the allocation of GNMA funds, there is no showing that the Secretary has used any effort at all, much less his best efforts, to secure GNMA commitments to purchase mortgages in the Wash West Properties development. My order, as I amend it today, requires the Secretary to do what he promised to do—to use his best efforts, and to exercise the power of his office. 12 U.S.C. § 1723a. It is my duty to enforce the terms of that promise, and, mindful of the understandings of all the parties when the bargain was struck, to protect the compromise. *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 235–36, 95 S.Ct. 926, 933–34, 43 L.Ed.2d 148 (1975). What the Secretary proposes here is that he be permitted not to do what he agreed to do and in that breach of his agreement, to vitiate the consent decree. I cannot find any language in the statute that forbids the Secretary from agreeing to exercise his discretionary power over GNMA. Neither can I read the anti-injunction language as barring an order directed to the Secretary, and not entered "against the Association." In this case, if the Secretary were to do what he agreed to do, that is, to use his "best efforts," and there is not evidence that he has done so, it is quite clear that the terms of the consent decree could be satisfied. Plaintiffs have supplied me with a copy of a HUD "NEWS RELEASE," HUD–No. 82–8 (January 15, 1982) in which HUD announces that GNMA will set aside funds as a first priority for projects with UDAG grants, and, as a second priority, projects approved for 1981 which were unable to obtain GNMA tandem financing. It is astonishing to me that the Secretary, who has the authority to establish these relative priorities would not, in using his "best efforts," create a first priority class of projects for which he had agreed to secure all necessary federal agency approvals.

Having concluded that a reasoned interpretation of 12 U.S.C. § 1723a permits the order I have entered in this case, I must conclude that the likelihood of HUD's prevailing on appeal is not great enough to support granting its motion for a stay. I also observe that permitting HUD to delay implementation of the order during the appeal period increases the risk that the project will not be completed and that the fair and laboriously-negotiated consent decree will be rendered meaningless. When weighing the possible injury to plaintiffs if the stay is granted, i.e. the project will never be completed, against the injury to HUD if the stay is not granted, i.e. one approved project will be favored over another approved project, it is clear that harm inflicted if the stay is granted far outweighs the harm that might be perceived in ordering the Secretary to choose a particular project. *Cf. Halderman v. Pennhurst State School,* 451 F.Supp. 233, 235, (E.D.Pa. 1978).

I am also aware, however, that GNMA financing has not yet been allowed any developer this year, and that my order now requires HUD to make the financing available immediately. I am certain, however, that even if HUD had specifically agreed in the consent decree to provide GNMA financing, or if GNMA financing were as readily available today as it was when the consent decree was negotiated, the financing would not yet be available. The understanding of the parties at the time of the negotiation of the consent decree, as I have found previously, was to utilize GNMA tandem financing, as it was then provided. Because it was my intention to modify the consent decree to embody what the parties to the consent decree intended, I will amend my order to require HUD to make GNMA

tandem financing available when GNMA commitments to purchase mortgages are issued through the procedures it chooses to follow. *See* HUD News Release, No. 82–8 (January 15, 1982).

### ORDER

AND NOW, this 28th day of January, 1982, it is hereby Ordered that defendant HUD's Motion for Stay Pending Appeal is DENIED. It is further Ordered that the Court's Order of November 18, 1981 is AMENDED as follows:

"The Secretary shall make GNMA tandem financing at an interest rate of 7.5% available to Wash West Properties when GNMA funding authorizations are allocated in 1982."

Insofar as the Court's Order requires tandem financing to be made available immediately, the Order is VACATED.

AND IT IS SO ORDERED.