680 F.2d 315
 Barbara FOX, Alan M. Lerner, Georgiana Teaford, Alice
Lipscomb, Thelma Dingle, Hattie Shelton, Catherine Neff,
George Malone, Faye Levison, Harry Hornickel, Richard
Callahan, and Richard Apfelbaum, on behalf of themselves and
all others similarly situated
v.
The UNITED STATES DEPARTMENT OF HOUSING AND URBAN
DEVELOPMENT; James Lynn, Individually and in his official
capacity as Secretary of the United States Department of
Housing and Urban Development; Theodore Robb, Individually
and in his capacity as Regional Administrator of Region III,
U. S. Department of Housing and Urban Development; Douglas
Chafin, Individually and in his capacity as Acting Area
Director of the Philadelphia Area Office of the U. S.
Department of Housing and Urban Development; the City of
Philadelphia; Frank L. Rizzo, Individually and in his
official capacity as Mayor of the City of Philadelphia; the
Relocation Service of the City of Philadelphia; Olive Jo
Johnson, Individually and in her official capacity as
Assistant Director of the Relocation Service of the City of
Philadelphia; the Redevelopment Authority of the City of
Philadelphia; Michael J. Lonergan, Individually and in his
official capacity as Chairman of the Redevelopment Authority
of the City of Philadelphia; Augustine Salvitti,
Individually and in his official capacity as Executive
Director of the Redevelopment Authority of the City of Philadelphia,
The United States Department of Housing and Urban
Development; James Lynn, Individually and in his official
capacity as Secretary of the United States Department of
Housing and Urban Development; Theodore Robb, Individually
and in his capacity as Regional Administrator of Region III,
U. S. Department of Housing and Urban Development; Douglas
Chaffin, Individually and in his capacity as Acting Area
Director of the Philadelphia Area Office of the U. S.
Department of Housing and Urban Development, Appellants.
 Nos. 82-1039, 82-1063.
 United States Court of Appeals,
Third Circuit.
 Argued April 27, 1982.
Decided June 1, 1982.
Rehearing and Rehearing In Banc Denied July 9, 1982.
 
 Anthony J. Steinmeyer, Michael Jay Singer (argued), Attys., Appellate Staff Civ. Div., Dept. of Justice, Washington, D. C., for appellants; Peter F. Vaira, U. S. Atty., Philadelphia, Pa., J. Paul McGrath, Asst. Atty. Gen., Washington, D. C., on brief; Gershon M. Ratner, Associate Gen. Counsel for Litigation; Edward G. Weil, Dept. of Housing and Urban Development, Washington, D. C., of counsel.
 Harold R. Berk (argued), Philadelphia, Pa., Alan M. Lerner, Cohen, Shapiro, Polisher, Shiekman & Cohen, Philadelphia, Pa., for appellees.
 Carl S. Primavera, Legal Div., Redevelopment Authority, Philadelphia, Pa., for appellee, Redevelopment Authority of the City of Philadelphia.
 Kathryn S. Lewis, Chief Asst. City Sol., Law Dept., City of Philadelphia, Philadelphia, Pa., for appellee, City of Philadelphia.
 Before ALDISERT, WEIS and BECKER, Circuit Judges.
 OPINION OF THE COURT
 ALDISERT, Circuit Judge.
 
 
 1
 Alternatively interpreting and modifying a consent decree, the district court ordered the Secretary of Housing and Urban Development to set aside approximately $11 million in Government National Mortgage Associates (GNMA) tandem financing at an interest rate of 7.5% to finance rehabilitation of 111 units and construction of 20 units of subsidized rental housing in the Washington Square area of Philadelphia. 532 F.Supp. 540. The Secretary has appealed, contending that the language of the consent decree does not support the court's interpretation, and that modification of the consent decree to impose this substantial burden was unlawful. We agree with HUD and reverse.[1]
 
 I.
 
 2
 The present appeal emerges from a class action suit brought in 1969 seeking to enjoin HUD and the City of Philadelphia from urban renewal activities in the Washington Square area because of inadequate provision for citizen participation. Various intervenors, including the private appellees here, joined the litigation contending that the urban renewal undertaken by the defendants violated federal law. They demanded that HUD and the City provide housing in the area for minorities and lower income persons displaced by renovations or forced to move because of increased rental rates. Following vigorous pre-trial skirmishes, described by the district court as "set in a bed of tensions generated by the nature of the parties and disputes involved," Fox v. U. S. Dept. of Housing & Urban Development, 468 F.Supp. 907, 909 (E.D.Pa.1979), the parties settled their differences in 1978 and obtained court approval of a consent decree in January 1979. The settlement provided for the construction or rehabilitation of 131 housing units in Washington Square by private developers and for rental subsidies under § 8 of the Housing Act for the tenants of those units.[2] The City Redevelopment Authority, also a defendant in the suit, agreed to assist eligible members of the affected classes to obtain housing in a § 8 housing project that the Postal Workers Union was planning to build. The defendants admitted no violation of applicable laws.
 
 
 3
 The essential facts leading to the current controversy over implementation of the consent decree are not in dispute. In accordance with the decree, HUD published a "Notification of Fund Availability" for § 8 assistance for 131 units and, following a review of proposals submitted by private developers, approved Wash West Properties as the developer in 1979. On June 19, 1981, Wash West Properties submitted to HUD an application for a firm commitment of FHA mortgage insurance on the development. The application assumed that GNMA would provide assistance under its "tandem financing" program to secure financing at an interest rate of 7.5%.[3] Although it had agreed to accept and process the application, HUD had informed the developer that a firm commitment for mortgage insurance did not guarantee financing, and that no funds had yet been allocated to GNMA. HUD took the position that, if funds were allocated, Wash West would be subject to all rules and requirements of GNMA, including the requirement that it participate with developers of other projects in a lottery for the limited funding available under the program. HUD encouraged Wash West "to seek other sources of financing so that this project may go to a construction start."
 
 
 4
 Upon learning of HUD's position, the plaintiffs demanded that it guarantee GNMA tandem financing for the project and announced that if HUD failed to do so, they would return to district court to obtain an order under the consent decree requiring the financing; they did so when HUD again advised them that financing would not be forthcoming unless the developer succeeded in the lottery. They argued first that HUD's failure to provide tandem financing violated the existing decree, and alternatively, that the court should modify the decree to require tandem financing because without it, the project would fail.
 
 
 5
 The court accepted both arguments. It first concluded that HUD was obliged to provide 7.5% GNMA financing under the following provision of the decree:
 
 
 6
 13. The parties shall use their best efforts to obtain approvals necessary to effectuate the terms of this settlement from the City of Philadelphia and any necessary federal, state or local agencies.
 
 
 7
 The district court interpreted this sentence as "capable of being fairly read as imposing on HUD the obligation to approve an application from Wash West Properties for (GNMA) financing" and stated that it could order the relief sought "on the basis of that language alone." To support its conclusion, the court observed that it was within HUD's power to set aside funds for the project because GNMA is under the control of the Secretary. Failure to do so, in the court's view, violated the requirement that HUD use its best efforts under the above clause. Nevertheless, "in the interest of clarity," the court examined the circumstances surrounding the formulation of the decree and the radical change in mortgage interest rates following its entry and modified the decree to require GNMA financing so that the § 8 housing could be built.
 
 
 8
 HUD appealed and while the appeal was pending Wash West participated unsuccessfully in the lottery for GNMA financing. In accordance with the district court's order, however, GNMA has set aside $11 million in mortgage funds pending the disposition of this appeal.
 
 II.
 
 9
 Notwithstanding the argumentum ad misericordiam advanced by the plaintiffs that unless 7.5% financing is available, the long-awaited redevelopment project will not materialize, what is before the court is not an adjudication of the merits of the original dispute. Irrespective of personal views regarding the desirability vel non of this particular redevelopment project and its impact on the Philadelphia community, the role of the court here is limited; it is not to supersede a Congressional mandate or administrative decisions of the Executive branch; our role requires dispassionate and neutral application of settled legal precepts governing consent decrees. We will consider in turn whether the consent decree included an obligation to provide GNMA financing, and if it did not, whether the circumstances justified modification of the decree.
 
 
 10
 Although consent decrees are judicial acts, they have many of the attributes of contracts voluntarily undertaken, Philadelphia Welfare Rights Org. v. Shapp, 602 F.2d 1114, 1119-20 (3d Cir. 1979), cert. denied, 444 U.S. 1026, 100 S.Ct. 689, 62 L.Ed.2d 660 (1980), and are construed according to traditional precepts of contract construction, United States v. ITT Continental Baking Co., 420 U.S. 223, 236-238, 95 S.Ct. 926, 934-935, 43 L.Ed.2d 148 (1975). Courts must be cautious, therefore, to confine themselves to the agreement the parties consented to have entered, remembering that in most instances the defendant has neither admitted nor been found by a court to have committed any wrongdoing. As the Supreme Court explained in United States v. Armour & Co., 402 U.S. 673, 681-82, 91 S.Ct. 1752, 1757-1758, 29 L.Ed.2d 256 (1971) (footnote omitted):
 
 
 11
 Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus the decree itself cannot be said to have a purpose; rather the parties have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it.
 
 
 12
 The "four corners" rule of Armour is consistent with the ordinary principle of contract construction that resort to extrinsic evidence is permissible only when the instrument itself is ambiguous, although frequently the circumstances surrounding its formation will be relevant to its meaning. "Such reliance does not in any way depart from the 'four corners' rule of Armour." ITT Continental Baking, 420 U.S. at 238, 95 S.Ct. at 935.
 
 
 13
 Interpretation of a contract is ordinarily a question of law for the courts. But when the contract is ambiguous, extrinsic evidence may be required to discern its meaning, transforming the question into one of fact to be resolved by the fact finder, except where the evidence and resulting inferences are uncontroverted. Barco Urban Renewal Corp. v. Housing Authority, 674 F.2d 1001 at 1007-1008 (3d Cir., 1982). Whether a contract or consent decree requires extrinsic evidence in aid of interpretation is, of course, itself a question of interpretation subject to plenary review. The first task, therefore, is to determine whether the instrument by its terms unambiguously covers the dispute. The relevant search, as in contract interpretation, is not for the subjective intention of the parties "but what (their) words would mean in the mouth of a normal speaker of English, using them in the circumstances in which they were used."[4] The rule employed to reach this result is that language must be interpreted in accordance with its generally prevailing meaning unless the parties manifest a different intention or the words are technical. ITT Continental Baking, 420 U.S. at 238, 95 S.Ct. at 935; see Restatement (Second) of Contracts § 202(3). As in statutory construction, we reject a view that would "make a fortress out of a dictionary," Cabell v. Markham, 148 F.2d 737, 739 (2d Cir.) (L. Hand, J.), aff'd 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945), because a word or a phrase "is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." Towne v. Eisner, 245 U.S. 418, 425, 38 S.Ct. 158, 159, 62 L.Ed. 372 (1918) (Holmes, J.). With these precepts and admonitions as our guides, we turn to the contentions of the parties and the district court's analysis of the consent decree.
 
 III.
 
 14
 We conclude that the district court erred by interpreting the consent decree to include an obligation to provide financing. The court relied on the parties' obligations under paragraph 13 to "use their best efforts to obtain approvals necessary to effectuate the terms of this settlement from the City of Philadelphia and any necessary federal, state or local agencies," and concluded that "this alone" was sufficient to award the relief sought. Presented thus as a question of law, our task is to determine from the four corners of the decree whether "best efforts" by HUD to obtain "approvals necessary to effectuate the terms of (the) settlement" incorporates a promise by HUD to provide tandem financing in the amount of $11 million.
 
 
 15
 The plaintiffs would have us read this term expansively; we decline their invitation. The consent decree contains no undertaking by HUD, express or implied, to provide GNMA financing. The plaintiffs do not contend that § 8 funding includes mortgage financing of the housing units. Only two paragraphs of the decree relate to the financing of the development. The first is paragraph 12, which states:
 
 
 16
 HUD shall provide FHA mortgage insurance, if requested, by the selected developer or developers provided that all criteria for the issuance of such insurance are met.
 
 The second is paragraph 21:
 
 17
 The Philadelphia Housing Authority shall not be involved in the development or operation of the housing units to be provided under this Consent Decree, except insofar as the Philadelphia Housing Finance Corporation, an instrumentality of the Philadelphia Housing Authority, may provide permanent mortgage financing pursuant to 24 C.F.R. § 811[5] for one or more of the Section 8 proposals funded by HUD.
 
 
 18
 The remaining provisions of the consent decree relate to HUD's obligation to make available budget and contract authority for the construction and rehabilitation of the 131 § 8 units, PP 2-3; site selection and approval by HUD and the city, PP 4-8; provision of design standards for the developer, P 8; notice and comment opportunities for the parties on the selected sites, PP 8-9; and various provisions concerning the administration of the program. As the district court observed, the agreement was "deliberately drafted to permit any kind of financing...." (Emphasis supplied).
 
 
 19
 The only reasonable conclusion to be drawn from paragraph 13 is that the "approvals" HUD promised to use its best efforts to obtain were those involved in the many bureaucratic steps necessary for construction of the § 8 project. We do not read the decree so narrowly that every approval necessary must be contained within the decree. Indeed, HUD suggests that the approvals might relate also to matters such as zoning permits, historic reviews, licenses, and environmental impact statements, none of which are covered by other terms of the decree. Each of these, however, is of a different order than the obligation plaintiffs seek to impose; none involves direct expenditure of funds. HUD's funding obligation under § 8 was explicitly set forth, and it was error for the court to imply an additional funding obligation, regardless of the court's assertion that Wash West could not proceed without this particular financing.
 
 IV.
 
 20
 Extrinsic evidence was received by the district court for two purposes: first, on the motion for enforcement, to disclose the intention of the parties to the consent decree; and second, to justify the reopening of the decree on the basis of changed circumstances. We turn to the evidence designed to show the intention of the parties.
 
 
 21
 Although not specifically determining that the decree was ambiguous, the court nevertheless relied on extrinsic evidence to support its conclusion that the "approvals" included an obligation to provide financing. Even if we would also indulge the plaintiffs and assume that extrinsic evidence was required to reveal exactly what HUD had undertaken in the settlement, our result would not be changed. The evidence adduced at the hearing indicated that GNMA financing was available in 1978 for all qualifying applicants and was then the most common means by which § 8 projects were financed, although the consent decree itself suggested that alternatives, such as tax-free bond issues, might also be used. Evidence was adduced that the developer of this project, at that time unknown, would probably seek GNMA financing. But this evidence did not show that the plaintiffs sought from HUD a commitment to provide such funding or that HUD offered one. Without this critical evidence, the plaintiffs' entire case collapses. No witness could recall that GNMA financing was ever discussed during the negotiations. Although present and former HUD officials indicated that the agency was committed to providing "funding" for the development even before the consent decree was entered, the funding then under consideration was § 8 rent subsidies. This interpretation was verified by testimony at the hearing and by a memorandum of understanding entered by the parties prior to approval of the consent decree.[6] The evidence fell short of demonstrating an undertaking to provide GNMA financing and, indeed, the district court found no such commitment.
 
 
 22
 Reduced to its essence, the plaintiffs' contention is simply that because GNMA financing was readily available in 1978, HUD must have agreed to provide it in 1981, or indeed at any time in the future, regardless of the market conditions or Congressional appropriations to GNMA. The district court's acceptance of this position without supporting evidence is simply untenable. Having examined the requirement of paragraph 13 both within the four corners of the consent decree and in the context of the surrounding circumstances, we find no obligation implicit therein that HUD provide 7.5% mortgage financing. Indeed, the specific provisions concerning FHA mortgage insurance and the possibility of tax-exempt bond financing suggest that financing was a matter of concern, but not of sufficient concern to require commitments.
 
 
 23
 The plaintiffs' failure to obtain an explicit commitment from HUD and their assumption that GNMA financing would be available when plans for the development were approved leads us to conclude that plaintiffs also assumed the risk that it would not. "(T)he instrument must be construed as it is written," United States v. Armour & Co., 402 U.S. at 682, 91 S.Ct. at 1757, and not as one of the parties would have written it had it ultimately prevailed. The agreement was the result of a compromise: in exchange for the risk and uncertain outcome of the litigation, "the parties each (gave) up something they might have won had they proceeded (to trial)." Id.[7]
 
 
 24
 The plaintiffs have not sought enforcement of an existing term, but imposition of an additional term beyond the scope of HUD's consent. As a matter of enforcement, therefore, the order cannot be upheld. We turn now to the district court's alternative holding which modified the consent decree on the basis of changed circumstances.
 
 V.
 
 25
 The standard for reopening a consent decree is a strict one; the relief is extraordinary and may be granted only upon a showing of exceptional circumstances. Philadelphia Welfare Rights Org. v. Shapp, 602 F.2d 1114, 1119 (3d Cir. 1979). As with all final judgments, the parties have a strong interest in the finality of the decision; in addition, when the plaintiffs have made "a free, calculated and deliberate choice to submit to an agreed upon decree rather than seek a more favorable litigated judgment their burden ... is perhaps even more formidable than had they litigated and lost." Id. at 1120.
 
 
 26
 Courts exercising their equitable jurisdiction are not powerless to alter the terms of a prospectively operating consent decree. In United States v. Swift & Co., 286 U.S. 106, 114-115, 52 S.Ct. 460, 462-463, 76 L.Ed. 999 (1932) (Cardozo, J.), the Court declared that a court has the power to revoke or modify a consent decree "if satisfied that what it has been doing has been turned through changing circumstances into an instrument of wrong," but it noted an important qualification to that power:
 
 
 27
 We are not framing a decree. We are asking ourselves whether anything has happened that will justify us now in changing a decree. The injunction, whether right or wrong, is not subject to impeachment in its application to the conditions that existed at its making. We are not at liberty to reverse under the guise of readjusting.... The inquiry for us is whether ... changes are so important that dangers, once substantial, have become attenuated to a shadow.... Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned.
 
 
 28
 Id. at 119, 52 S.Ct. at 464. The precepts articulated in this passage have been applied by this court on several occasions. See Philadelphia Welfare Rights Org. v. Shapp, 602 F.2d at 1119; United States Steel Corp. v. Fraternal Ass'n of Steel Haulers, 601 F.2d 1269, 1274 (3d Cir. 1979); Mayberry v. Maroney, 558 F.2d 1159, 1163 (3d Cir. 1977). The district court, relying on its equitable powers and United States v. United Shoe Machinery Corp., 391 U.S. 244, 88 S.Ct. 1496, 20 L.Ed.2d 562 (1968), modified the decree to require GNMA financing of the project.
 
 VI.
 
 29
 It is important to emphasize that the question for decision in this case is whether the consent decree should have been modified to impose a duty on the defendant that was not contained in it, and not as in Swift & Co., whether the defendant should be released from the obligations imposed by the decree. The cases from this court relied upon by the plaintiffs similarly involve defendants seeking relief from the terms of consent decrees under Fed.R.Civ.P. 60(b)(5). HUD, as a defendant, has not moved for relief under rule 60(b), rather the plaintiffs have invoked the equitable power of the court to impose additional duties upon HUD.
 
 
 30
 The only instance in which the Supreme Court has endorsed imposition of new and substantial burdens on a defendant party to a consent decree, United States v. United Shoe Machinery Co., 391 U.S. 244, 88 S.Ct. 1496, 20 L.Ed.2d 562 (1968), relied on by the district court here, is clearly inapposite. In United Shoe Machinery, there was an explicit prior adjudication that the defendant had monopolized the relevant market in violation of § 2 of the Sherman Act. In this context the Supreme Court required the district court to modify the decree to assure complete extirpation of the illegal monopoly. "Its duty is implicit in the findings of violation of § 2 and in the decisions of this Court as to the type of remedy which must be prescribed." Id. at 251. See also Bolden v. Pennsylvania State Police, 73 F.R.D. 370 (E.D.Pa.1976).[8]
 
 
 31
 Although we do not doubt the power of a court to modify an injunctive order entered by consent, we think that in the usual case a court may not impose additional duties upon a defendant party to a consent decree without an adjudication or admission that the defendant violated the plaintiffs' legal rights reflected in the consent decree and that modification is essential to remedy the violation. We need not now decide what exceptional circumstances might permit a departure from this general rule, because we are satisfied that this case is not an exceptional one. The contention is solely that the plaintiffs' expectations have been frustrated by changes in the mortgage market, changes beyond the control of the defendants that might have been anticipated by the plaintiffs. To impose additional duties under the decree because of those changes is to disregard the basic rights of litigants who waive their right to litigate defenses by consenting to have a decree entered against them. The conditions upon which rights are waived must be respected. Armour & Co., 402 U.S. at 682, 91 S.Ct. at 1757-1758; see also United States v. Atlantic Refining Corp., 360 U.S. 19, 23, 79 S.Ct. 944, 946, 3 L.Ed.2d 1054 (1959); Hughes v. United States, 342 U.S. 353, 357-58, 72 S.Ct. 306, 308, 96 L.Ed. 394 (1952).
 
 VII.
 
 32
 As the district court candidly observed: "The consent decree was deliberately drafted to permit any kind of financing, but the custom and practice at the time dictated Ginnie Mae financing." The court also noted, "Of course, the consent decree does speak of tax exempt bond financing." In sum, the case comes down to this: the plaintiffs wanted to keep all their options open to obtain GNMA financing, tax-exempt bond financing, or any other financing; and as a result, they did not demand that HUD make a permanent commitment, nor did HUD offer one. Changes in economic conditions subsequent to the entry of the consent decree have made GNMA tandem financing the most attractive alternative. The appellees therefore want what is legally impossible: a court order to impose upon HUD an $11 million mortgage commitment at 7.5% in 1982 on the basis of a 1978 written agreement reduced to a consent decree that neither explicitly mentions the subject nor can be construed to include such an obligation on the basis of its own terms and extrinsic evidence; alternatively, they seek modification of the decree to impose a new and substantial duty on HUD when that agency has neither been adjudged to have committed any wrongdoing nor admitted any.
 
 
 33
 The judgment of the district court will be reversed and the cause remanded with a direction to vacate the order of January 28, 1982.
 
 
 
 [1]
 The Secretary argues also that the anti-injunction provision in the legislation setting forth the powers of GNMA, 12 U.S.C. § 1723a, bars the district court's order. Because we reverse the judgment on the court's interpretation and modification of the consent decree, we need not meet this issue
 
 
 [2]
 Section 8 of the Housing Act, 42 U.S.C. § 1437f, was enacted to assist "lower-income families in obtaining a decent place to live and (to promote) economically mixed housing" by subsidizing the rental payments of qualifying tenants to owners of the housing. See Vandermark v. Housing Authority of City of York, 663 F.2d 436 (3d Cir. 1981). Section 8 does not authorize subsidies for mortgage financing of construction or rehabilitation
 
 
 [3]
 GNMA is a wholly-owned government corporation whose primary function is purchasing and selling FHA insured mortgages. See 12 U.S.C. § 1717. The Secretary of HUD has authority for administering GNMA and determining its policies. 12 U.S.C. § 1723, although GNMA is headed by a president who handles all executive functions
 The particular financing scheme plaintiffs seek to use is GNMA "Tandem-25" financing. Under this program, GNMA agrees to purchase at face value from a lending institution a conventional, FHA insured mortgage with a 7.5% interest rate. GNMA does not hold the mortgage, but sells it at the market rate. Current rates in the mortgage market dictate substantial discounts in the resale resulting in large cash losses by GNMA. Developers, of course, are anxious to obtain this financing and their demand has required GNMA to allocate its limited funds by lottery. The appellees note that the current administration plans to end the GNMA tandem program at the end of fiscal year 1982.
 
 
 [4]
 Holmes, The Theory of Legal Interpretation, 12 Harv.L.Rev. 417, 419 (1899)
 
 
 [5]
 24 C.F.R. § 811 allows public housing agencies to issue tax-exempt bonds to finance § 8 housing projects
 
 
 [6]
 The memorandum of understanding provides in relevant part:
 d. HUD will use its best efforts to obtain funding for the project apart and aside from any funds allocated to the City under the Year III Community Development Block Grant or from any presently committed Section 8 funds extended or to be extended to the City.
 
 
 [7]
 The district court also recognized the compromise when it approved the decree, observing that "although plaintiffs' Fair Housing claim seems strong, success is not certain, especially when the case has not been presented from an adversary position." 468 F.Supp. at 916
 
 
 [8]
 Jordan v. School District of City of Erie, 548 F.2d 117 (3d Cir. 1977), cited by the appellees, is also inapposite. Jordan held that the district court erred when it vacated a consent decree because it concluded that agreement by the parties was required to modify the decree, even though the applicable law had changed subsequent to its entry and the requested modification was intended to track this change. See System Federation No. 91, Railway Employees' Department v. Wright, 364 U.S. 642, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961)