**UNITED STATES of America, Plaintiff-Appellant,**

v.

**BOARD OF EDUCATION OF the CITY OF CHICAGO, Defendant-Appellee.**

**Nos. 83-2308, 83-2402 and 83-2445.**

United States Court of Appeals, Seventh Circuit.

Argued Aug. 25, 1983.

Decided Sept. 9, 1983.

William Bradford Reynolds, U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellant.

Hugh R. McCombs, Jr., Isham, Lincoln & Beale, Chicago, Ill., for defendant-appellee.

Before CUMMINGS, Chief Judge, and WOOD and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

This is an appeal from a June 30, 1983, order of the district court, as modified by two orders entered on July 26, 1983, which interpreted and enforced a consent decree that was executed by the United States and the Board of Education of Chicago ("Board") in 1980. For the reasons set forth below, we affirm in part and vacate in part.

### FACTS

On September 24, 1980, the United States filed a complaint against the Board charging that Chicago's public school system was racially segregated in violation of the fourteenth amendment and titles IV and VI of the Civil Rights Act of 1964. On the same day, the parties filed a previously-negotiated consent decree ("Decree"), in which they agreed that the Board would develop and

implement a system-wide plan to remedy the effects of past segregation of black and Hispanic students in Chicago schools. The Decree also provides, in ¶ 15.1, that

> [e]ach party is obligated to make every good faith effort to find and provide every available form of financial resources adequate for the implementation of the desegregation plan.

The Board developed and implemented a desegregation plan beginning in 1981. The district court upheld the constitutionality of the plan on January 6, 1983. *See United States v. Board of Education of Chicago,* 554 F.Supp. 912 (N.D.Ill.1983).

On May 31, 1983, the Board filed a petition for an order directing the United States to comply with ¶ 15.1 of the Decree, and it requested declaratory and injunctive relief. Among other things, the Board asked the district court: (1) to find that the United States had violated ¶ 15.1; (2) to direct the United States to identify funds that could be made available to the Board for the desegregation plan; and (3) to order the United States to provide immediate financial assistance to the Board to the extent that funds were identified as available and needed by the Board to implement the plan.

After five days of hearings, the district court entered an order on June 30, 1983, ruling that while the Board had made every good faith effort to "find and provide every available form of financial resources," [1] the United States had not. The district court found that the United States had violated ¶ 15.1 by failing to provide available desegregation funding, by taking no affirmative steps to find and provide such funding, and by taking affirmative steps to minimize and eliminate available sources of funding. The court ruled that the Decree obligates the United States to provide, from "available" federal funds, the level of funding that the Board needs to implement adequately its desegregation plan, and that the Board is unable to obtain from other sources. *United ed States v. Board of Education of Chicago,* 567 F.Supp. 272 (1983) ("Order of June 30"). The court determined the obligation of the United States for funding the Board's desegregation plan in the 1983–84 school year to be not less than $14.6 million,[2] and it directed the United States to undertake an "active and affirmative program of making every good faith effort to find and provide" the $14.6 million and such further levels of funding as the district court may determine. *Id.* at 275–76.

The court identified three sources of federal funding that are potentially "available" to the Board to satisfy the federal government's commitment: approximately $8.9 million in the Secretary of Education's Discretionary Fund;[3] $24 million in Title IV funds;[4] and $28.08 million in the Special

1. The United States does not challenge on appeal the finding that the Board acted in good faith.

2. Although this $14.6 million figure is identified in the district court's order as "the amount of additional incremental expenditures required by Board to achieve the necessary threshold level of funding for Educational Components in predominantly minority schools," Order of June 30 at 275, the court made no findings of fact with regard to this amount. This omission is significant and can be addressed by the district court during the proceedings that will be held on remand.

3. Six percent of the funds appropriated under subchapter II of the Educational Consolidation and Improvement Act, 20 U.S.C. § 3811 *et seq.,* are reserved by the Secretary of Education to carry out the purposes specified in 20 U.S.C. § 3851. 20 U.S.C. § 3813(a). Out of the $28.765 million set aside for the Secretary's discretionary fund for fiscal year 1983, approximately $10.7 million must be used to fund the programs mandated by § 3851(b). Finding of Fact No. 42. Of the remainder, which the Secretary had discretion to spend within the broad limits of § 3851(a), the court determined that just under $9 million remained and was potentially available to the Board. Finding of Fact No. 43.

4. Title IV funds may be used to pay the cost of in-service training for school personnel in dealing with, and the cost of employment specialists in advising in, problems incident to desegregation. 42 U.S.C. § 2000c–4(a). The Secretary also is authorized to render technical assistance to school boards in the implementation of desegregation plans. 42 U.S.C. § 2000c–2. In making a Title IV grant, the Secretary is permitted to take into consideration any factors he finds relevant in addition to those specified by statute. 42 U.S.C. § 2000c–4(b).

Programs and Populations Account.[5] In addition, the district court ordered the Executive Branch to identify and support any available legislative initiatives that would provide financial assistance to the Board for desegregation expenditures. To effectuate its order and to insure that the funds would remain available pending final resolution of the case, the court enjoined the United States from spending or obligating certain funds in the Secretary's Discretionary Fund and the Department of Education's Special Programs and Populations Account. Finally, the United States was ordered to undertake an affirmative program to preserve the continued availability of $250 million in excess Guaranteed Student Loan funds[6] and to support legislative initiatives to set aside this $250 million in an escrow fund, for potential use in fulfilling the United States' obligations under ¶ 15.1 over the next five years.

In appealing the district court's orders, the United States essentially raises two issues: first, whether the district court correctly interpreted the nature and extent of the United States' obligation under ¶ 15.1 of the Decree; and second, if its interpretation was correct, whether the remedies imposed by the district court constitute an abuse of discretion.

## INTERPRETATION OF PARAGRAPH 15.1

In interpreting ¶ 15.1, the district court found that ¶ 15.1 imposes an obligation on the United States to do more than merely assist the Board in looking for and applying for federal funds. See Transcript of June 8, 1983, at 15; Transcript of June 27, 1983, at 23. Furthermore, the court determined

that "the United States' promise to 'make every good faith effort' to find and provide available funds entails a serious and substantial obligation." Conclusion of Law No. 8. In line with this interpretation of ¶ 15.1, the district court concluded that, under this provision, the United States cannot work actively to make financial resources unavailable. Conclusion of Law No. 4. Finding that the United States had worked to make financial resources unavailable, the district court held that the United States violated its obligations under the Decree. Conclusion of Law No. 10.

In appealing the district court's ruling, the United States argues that the court erred in reading into ¶ 15.1 an elastic promise by the United States to fund for five years all of Chicago's education costs that are denominated by the Board as desegregation expenses, to give Chicago priority over other school districts and educational priorities in dispersing federal education funds, and to shape the legislative program and policy determinations of the Executive Branch to maximize federal assistance to Chicago. Appellant's Brief at 14–15. The United States contends that ¶ 15.1 does not impose an obligation on its part to actually provide funds. According to the United States, ¶ 15.1 merely requires it to make a good faith effort to assist the Board in locating and applying for funds that have been earmarked by Congress for school districts undergoing desegregation. Id. at 17, 19. Thus, the United States argues essentially that money is "available" to the Board, within the meaning of ¶ 15.1, when funds have been appropriated for desegre-

---

**5.** The court's figure was derived from the following funds that were appropriated for Department of Education programs unrelated to desegregation and that the Executive Branch had requested Congress to rescind: $5.76 million for Women's Educational Equity, $19.44 million for Follow-Through, $960,000 for Territorial Training and $1.92 million for Aid to the Virgin Islands. Congress refused the administration's rescission request, and the court found that substantially all of the funds were not yet obligated to specific programs as of June 27, 1983. Finding of Fact No. 49. The money could be made available to the Board if

the Secretary reprograms the funds to the Title IV program and awards additional Title IV money to the Board. Conclusion of Law No. 11.

**6.** According to the Board, the administration has requested Congress to rescind the appropriation for $900 million in excess student loan funds, and the court ordered the Executive Branch to preserve part of that amount for potential use by Chicago. Appellee's Brief at 40. We note a lack of findings on this point, which should be rectified on remand.

382

gation purposes and the Executive Branch has provided its assistance in the application and awarding process.

The Board responds that the district court properly construed ¶ 15.1 to require substantial efforts by the United States to actually provide financing, and to preclude the Executive Branch from deciding to provide virtually no desegregation funding, notwithstanding the availability of funds. Appellee's Brief at 11. The Board concedes that Congress has the exclusive power to determine availability, *see id.* at 14, but the Board maintains that, within the meaning of ¶ 15.1, "every available" refers to funds that are or might be made subject to the Department of Education's control, including those funds that the Department might obtain by seeking reappropriation or new legislation from Congress. *See id.* at 17, 18.

It is clear that consent decrees are construed according to precepts of contract construction. *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 236–38, 95 S.Ct. 926, 934–35, 43 L.Ed.2d 148 (1975). Thus, the interpretation of consent decree provisions, like the interpretation of contract provisions, is a matter of law and subject to plenary review on appeal. *See Vertex Distributing, Inc. v. Falcon Foam Plastics, Inc.,* 689 F.2d 885, 892 (9th Cir. 1982); *Fox v. United States Department of Housing and Urban Development,* 680 F.2d 315, 319 (3d Cir.1982). The district court's views on interpretation, however, are entitled to deference. *Brown v. Neeb,* 644 F.2d 551, 558 n. 12 (6th Cir.1981) ("[f]ew persons are in a better position to understand the meaning of a consent decree than the district judge who oversaw and approved it").

In its conclusions of law accompanying the order of June 30, the district court stated that ¶ 15.1 is unambiguous in its terms and that extrinsic evidence is therefore unnecessary to a determination of its meaning. *See* Conclusion of Law No. 4. Nevertheless, the court examined the parol evidence offered by the United States and concluded that, if it had resorted to this evidence, its conclusions as to the meaning of ¶ 15.1 would be the same. *See id.*

■ We begin our review by finding the district court incorrect in its ruling that ¶ 15.1 is unambiguous. A provision is ambiguous if, after applying established rules of construction, it is reasonably susceptible to more than one meaning. *Richland Plantation Co. v. Justiss-Mears Oil,* 671 F.2d 154, 156 (5th Cir.1982). Aside from the broad language that permeates all of ¶ 15.1, the word "available" is capable of more than one meaning, as evidenced by the arguments put forth by the parties, and as acknowledged by the district court itself. *See* Conclusion of Law No. 4 (" '[a]vailable' might alternatively be viewed . . ."). The district court therefore was required to look at extrinsic evidence in order to discern the meaning of ¶ 15.1. *Sportmart, Inc. v. Wolverine World Wide, Inc.,* 601 F.2d 313 (7th Cir.1979). The district court's error in concluding that ¶ 15.1 is unambiguous is rendered harmless, however, by the fact that the court examined the parties' parol evidence and ruled that the evidence would not change the court's interpretation of ¶ 15.1.

■ The examination of extrinsic evidence is a question of fact, *Fox v. United States Department of Housing and Urban Development,* 680 F.2d at 319, and a finding based on extrinsic evidence will be set aside by the reviewing court only if it is clearly erroneous. *See International Merger & Acquisition Consultants, Inc. v. ARMAC Enterprises, Inc.,* 531 F.2d 821, 824 (7th Cir. 1976). Our own review of the relevant extrinsic evidence in this case,[7] as well as a reading of the language of ¶ 15.1 itself,

---

7. We find two pieces of evidence particularly supportive of the district court's interpretation. The first is that the government originally proposed that ¶ 15.1 obligates the parties to "search for" available financial resources; this language was later changed to "find and provide." Second, less than two months after signing the Decree, the Department of Education's general counsel wrote in a memorandum that one of the Department's responsibilities under the Decree was to "ensure that the Chicago School Board . . . receives the maximum amount of financial and technical assistance that this Department can provide."

leads us to conclude that the district court did not err in holding that the United States' obligations under the Decree go beyond assisting the Board in locating and applying for federal funds, and that ¶ 15.1 imposes a substantial obligation on the government to provide available funds to the Board.

The district court's conclusion that the United States violated ¶ 15.1 was based in part upon a series of broad policy decisions made by the Executive Branch that had the effect of reducing the amount of federal funds provided to local educational agencies for desegregation expenses. These policy choices included requesting Congress to reduce or rescind appropriations for certain programs, supporting legislation that replaced direct grant programs with federal block grants, and supporting the dismantling of the Department of Education. Findings of Fact Nos. 14–21, 24.

■ Considering the state of the record before us, a significant constitutional issue may exist as to whether a finding of lack of good faith properly can be based upon such a series of sweeping Executive policy decisions and recommendations. That important question, however, need not be addressed at this time, in light of this court's direction regarding the remedies that may be appropriate in this case (see the discussion of remedies *infra*). Since the district court also found that the United States had funds available for use by the Board but failed to provide them to the Board, we choose to base our affirmance of the finding of lack of good faith on this narrower and more discernible ground. Findings of Fact Nos. 34–35, 42–43.[8] Accordingly,

based on the specific and limited factual findings that the United States failed to provide these available funds to the Board, we affirm the district court's ruling that the United States is in violation of ¶ 15.1.

## REMEDIES

During the course of the five-day hearing in this case, the district court accepted, over the objection of the United States, evidence regarding the financial needs of the Board in implementing its desegregation plan. *See* Transcript of June 22, 1983, at 10–11. At the close of the hearing, the district court issued an opinion that contained, in addition to a finding of violation of ¶ 15.1 on the part of the United States, an order that the United States provide the Board with at least $14.6 million. Order of June 30 at 275. The court directed the United States to undertake an affirmative program of making every good faith effort to find and provide the $14.6 million and such other funding as the court may determine.[9] *Id.* at 275–76. This affirmative program is to include, to the extent necessary to meet the obligations of the United States: (1) efforts to provide the Board with funds that remain available for local desegregation assistance and that are located in the Secretary of Education's Discretionary Fund and the Special Programs and Populations Account (which includes Title IV monies); (2) efforts to secure congressional consent for the reallocation of excess funds from the Department's Guaranteed Student Loan Program into a fund from which support may be provided to implement the Board's desegregation plan; (3) efforts to identify other available monies or to reprogram or

---

**8.** There seems to be some discrepancy between Findings of Fact Nos. 34–35 and 42–43 on the one hand, which state that the Secretary of Education has authority to grant to the Board all or part of the unobligated funds in the Title IV Fund and in the Secretary of Education's Discretionary Fund, and Conclusion of Law No. 11 on the other hand, which states that it "appears" that the remaining Title IV funds and Discretionary funds may be available for use by the Board, although the district court "has not had the opportunity to verify their availability." This discrepancy, while troublesome, is not sufficient for us to overturn the factual findings

that the Secretary of Education has authority to grant unobligated funds to the Board, and that these funds are thus available. The district court should verify the availability of these funds during the proceedings that will be held on remand.

**9.** The district court decided that further obligations of the United States for the Board's desegregation funding for the 1983–84 school year would be determined at a later hearing. Order of June 30 at 275.

reallocate other excess monies; (4) support of legislative initiatives that would provide desegregation funding to school districts that have entered into consent decrees; (5) efforts to fund grantees and projects, which the Department had intended to fund through the Discretionary Fund and the Special Programs and Populations Account, with monies from other sources; and (6) cooperation with the Board to identify the Board's desegregation activities that are eligible for funding under Title IV. *Id.* at 276–77.

In its order of June 30, the district court also enjoined the United States from spending or taking action to obligate funds that are available for providing desegregation funding to the Board and that are located both in the Secretary of Education's Discretionary Fund and in the Department's Special Programs and Populations Account.[10] *Id.* at 277. In addition, the June 30 order directed the United States to undertake an affirmative program to preserve the availability of excess funds (including student loan funds) in the amount of $250 million that potentially can be used by the United States to fulfill its obligations under the Decree for the next five years.[11] *Id.* at 278.

██ We find that the district court acted with excessive dispatch in delineating specific remedies immediately after finding a violation of ¶ 15.1. Where another branch

of government is found to be in violation of a court order, courts have shown a preference for allowing that branch to come into compliance voluntarily before imposing specific remedial measures. In *Welsch v. Likins,* 550 F.2d 1122 (8th Cir.1977), the district court had found the state executive to be in violation of a court order requiring it to finance improvements in the conditions of state mental hospitals, and had enjoined the enforcement of a state constitutional provision and a fiscal control statute so as to compel additional financing for the hospitals. The Eighth Circuit vacated the injunction, holding that once the district court determined that additional financing was constitutionally required it should have permitted the legislature to provide the financing on its own initiative, before resorting to the rather drastic measure of an injunction. In *Rhem v. Malcolm,* 507 F.2d 333 (2nd Cir.1974), a case involving a successful constitutional challenge to conditions in a New York City pretrial confinement center, the district court had enjoined the city from further confining anyone in the detainment center after a certain date, but had indicated that it would vacate the injunction if the city submitted an acceptable remedial plan before that date. The Second Circuit vacated the injunction and remanded to the district court with instructions to allow the city to either submit a

---

**10.** This injunction, which is an extension and modification of the district court's preliminary injunction dated June 8, 1983, was to remain in effect until August 10, 1983, the date on which further hearings regarding remedies were scheduled. In an order dated July 26, 1983, the district court further extended the injunction until September 30, 1983.

The injunction exempts funds that are mandated by Congress for specific purposes, funds that were exempted from the June 8 injunction, funds that were obligated by the Department of Education prior to the close of business on June 8, 1983, and funds that are necessary to enable all fiscal-1983 grantees in five specific programs to operate at present levels up to August 15, 1983. Order of June 30 at 277. In another order dated July 26, 1983, the district court exempted additional funds that are necessary to enable the fiscal-1983 grantees in specific programs to operate at present levels up to September 30, 1983.

**11.** According to the district court's order,

[b]oth the form and details of [this] affirmative program shall be determined by the Executive Branch in its discretion except in the following respects (which shall be part of the program in any event):
(a) withdrawal of any pending proposal for the rescission by Congress of the appropriations for the excess funds, to the extent of $250 million;
(b) affirmative efforts by the Executive Branch to preserve the availability of excess funds in that amount; and
(c) such actions and legislative initiatives by the Executive Branch as are appropriate to set aside $250 million of excess funds in a reserve or escrow fund earmarked for potential use for fulfillment of the United States' obligations under the Consent Decree during the next five year period.

Order of June 30 at 278 (footnote omitted).

remedial plan or at least offer suggestions for a judicial remedy before actually imposing a remedial scheme of its own. The Second Circuit acknowledged that its approach might have the same ultimate effect as that of the district court, but noted that it had the "crucial practical advantage" of avoiding an unnecessary intrusion into the affairs of the executive and legislature. 507 F.2d at 340. *See also Duran v. Elrod,* 713 F.2d 292 at 297 (7th Cir.1983) (where a consent decree to reduce overcrowding in state prisons was violated by state officials, the district court set a population ceiling after a series of hearings and "clearly left to the appropriate state and county agencies the determination of the means to reach the [ceiling]").

These decisions were appropriate judicial responses based on sound principles of comity that should apply to this case. The Department of Education claims to have been operating in the belief that its only obligations under ¶ 15.1 were to provide the Board with assistance in locating and applying for federal desegregation funds. Having informed the Department of its erroneous interpretation, the district court should provide the Department an opportunity to fashion its proposed remedy for past noncompliance, as well as a chance to show that it intends to comply in the future, before structuring detailed remedial action that may still be necessary. Given the fact that the United States had been preliminarily enjoined from spending or obligating any available funds, there was no immediate need for the district court to devise specific remedies. Moreover, it is not clear from the record before us that the United States had an adequate opportunity to challenge the remedies selected by the district court, particularly the $14.6 million dollar figure. Thus, both the district court's designation of a specific dollar figure to be provided by the United States, and particularly its direction to the Executive Branch to set aside $250 million in escrow, were premature and inappropriate in this factual context and

constituted an abuse of discretion.[12] We affirm, however, those portions of the district court's July 26 orders temporarily freezing certain federal funds until September 30 but exempting additional funds. *See* note 10. Given the possibility that these funds might otherwise be spent and given the need to protect the interests of the Board by preserving the status quo, we find that the district court did not abuse its discretion by imposing the freeze.

Accordingly, we affirm the finding of a violation on the grounds previously noted, we affirm the injunction against spending unobligated funds, and we vacate all other remedies and remand for further proceedings not inconsistent with this opinion. Our prior stay is vacated, and our mandate shall issue forthwith.

---

**12.** This court recognizes that the district court made only a preliminary determination on the question of remedies and that it scheduled a

hearing for August 10, 1983, in order to determine further remedies.