**UNITED STATES of America, Plaintiff,**

v.

**BOARD OF EDUCATION OF the CITY OF CHICAGO, Defendant.**

**No. 80 C 5124.**

United States District Court, N.D. Illinois, E.D.

Aug. 10, 1984.

Remedial Order Aug. 13, 1984.

· William Bradford Reynolds, Ass't Atty. Gen., Alexander C. Ross, Civil Rights Division, Dept of Justice, Washington, D.C., Margaret C. Gordon, Ass't U.S. Atty., Chicago, Ill., for plaintiff.

Robert C. Howard, Robert M. Weissbourd, Hartunian Futterman & Howard, Chtd., C. Richard Johnson, Reynaldo P. Glover, Hugh R. McCombs, David Narefsky, Isham, Lincoln & Beale, Chicago, Ill., for defendant.

## SUPPLEMENT TO REMEDIAL ORDER

SHADUR, District Judge.

One of the keen insights of the late, great constitutional scholar, Professor William Winslow Crosskey, author of the two-volume *Politics and the Constitution in the History of the United States,* is that our country has really undergone *two* revolutions, rather than the usually-understood *one* revolution. First of course was the Founding Fathers' violent overthrow of Great Britain's system of absolute autocracy, as portrayed in the stirring words of the Declaration of Independence. Second, though seldom thought of as a revolution because it was marked by a peaceful "overthrow" (in a figurative sense), was the consensual Constitutional Convention of 1787. It replaced the unsatisfactory melange of independent states that had existed under the Articles of Confederation with the concept of Federalism, including a strong national government. But the strong national government was one with checks and balances, with power divided among its three branches rather than focused in a single head.

Now two centuries later we appear to have come full circle, with the United States voicing in this lawsuit theories of government that almost beggar the excesses that triggered the first Revolution—that conjure up images of an imperial Executive Branch exemplified in Louis XIV's "L'etat c'est moi": "The state, it is *I.*" We have in this case a solemn contractual undertaking in the form of a consent decree. It was entered into voluntarily by the United States the day this lawsuit was first filed in September 1980. This Court has held over a year ago, and our Court of Appeals has confirmed over ten months ago, that the United States is obligated by contract—it is firmly committed—"to find and provide every available source of financial resources adequate for the implementation of [the Board of Education's] desegregation plan."

Instead what the United States has done is to stonewall. What the United States says before this Court is that the promise of the United States is worthless:

1. Though the consent decree is a contract entered into by the United States through its Department of Justice, the United States now says it does not bind the President. It is said to be ultra vires, outside the power of the Attorney General of the United States who authorized it in September 1980, and is therefore an empty promise.

2. Alternatively, if the firm promise of the United States by its highest law officer *can* bind the President, the United States says it bound only President Carter. Why? Assertedly because no President can commit the United States and bind his successor—a concept that is the epitome of the personalized, imperial presidency.

If it is thought this characterization is overstated, it is only necessary to read the anarchic document filed by the United States in response to this Court's detailed June 8 Findings and Conclusions, which had cited chapter and verse describing the United States' stubborn non-compliance. If the kind of "state paper" that has been tendered to this Court by the United States were issued in the international arena, the word of the United States would be bankrupt in the world—or perhaps this Court is naive, and totalitarian governments might instead respond positively to such an expression, because they would recognize *that* kind of United States as one of their own.

Almost exactly midway between the first great Revolution and today, just over a century ago, our Supreme Court—surely a conservative one by today's standards—said in *United States v. Lee*, 106 U.S. 196, 220, 1 S.Ct. 240, 260, 27 L.Ed. 171 (1882):

> No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it.

Now the United States seeks to flout that principle as well as its contractual undertakings under the consent decree. That intransigence, that defiance of law, is impermissible in a government of law. To hold the United States to nothing more than its bargain does *not* violate the separation of powers, as the United States would have it, but rather fosters the rule of law this Court has sworn to uphold in its oath to support and defend the Constitution. This Court does not intrude on the Executive Branch. Rather the Executive Branch has committed itself to a contract in the exercise of its discretion, and it is to be held responsible for that decision.

For that reason this Court is entering its Remedial Order today.

## REMEDIAL ORDER

This Court has considered the Petition filed by the Board of Education of the City of Chicago ("Board"); Board's Motion for Further Declaratory and Injunctive Relief; the full record in this litigation to date; this Court's June 30, 1983 Findings of Fact, Conclusions of Law and Order ("Opinion II" or "June 30 Order"); the Court of Appeals Opinion of September 9, 1983 ("Opinion III"); and the evidence and memoranda received in connection with the hearing held March 20–29, 1984. In accordance with the Opinion, Findings of Fact and Conclusions of Law entered by this Court June 8, 1984 ("Opinion IV," "Findings" and "Conclusions"), 588 F.Supp. 132, which are specifically made part of this Remedial Order, it is hereby

ORDERED, ADJUDGED AND DECREED:

1. This Court has subject matter jurisdiction to declare and enforce the rights and obligations of the parties under the Consent Decree approved by and entered as a judgment of this Court September 24, 1980. This Court had jurisdiction pursuant to 28 U.S.C. § 1331 and § 1345 to approve and enter the Consent Decree, has continuing jurisdiction under these statutes and has retained jurisdiction by the terms of the Consent Decree to interpret, apply and enforce its provisions.

2. In June 30 Order ¶ 1b this Court determined that Section 15.1 of the Consent Decree (hereafter simply "Section 15.1") imposes a substantial obligation on the United States, pursuant to which "the Executive Branch of the United States is now required to take every affirmative step within its legal authority to seek to 'find and provide' desegregation funding to Board, until funding adequate for full implementation of the Plan has been provided." This Court further concluded the United States had violated its obligations under Section 15.1. (June 30 Order ¶ 1 and Opinion II Conclusions 4, 8, 9, 10) On September 9, 1983 the Court of Appeals affirmed, inter alia, the determination that Section 15.1 imposes a substantial funding obligation that had been violated by the United States. Essentially because it considered the United States should be given the benefit of the doubt rather than assuming continued noncompliance, the Court of Appeals concluded this Court had "acted with excessive dispatch in delineating specific remedies". (Opinion III, 717 F.2d 378 at 384–85) Accordingly the Court of Appeals noted that a hearing was to be held to determine the amount of funding adequate for the Plan, and held this Court should give the United States "an opportunity to fashion its proposed remedy for past noncompliance, as well as a chance to show that it intends to comply in the future, before structuring detailed remedial action that may still be necessary." (Opinion III, 717 F.2d at 385)

3. Since the June 30 Order and since the Court of Appeals decision, the United States has been given several such opportunities—far more than the benefit of the doubt called for by the Court of Appeals. Nevertheless, the United States has not remedied its violative conduct, but has instead continued its pattern of non-compliance. As detailed in Opinion IV, the Executive Branch of the United States has adopted and carried out a policy to deny funding to Board for implementation of its Desegregation Plan. In particular, the Executive Branch has:

(a) failed to provide available funds to Board [1];

(b) lobbied in Congress against legislation specifically designed to make funds available to Board;

(c) lobbied in Congress in support of legislation drafted by the Department of Education and specifically designed to make available funds unavailable; and

(d) otherwise acted to render funds unavailable to Board, and failed to take actions to render additional funds available.

Moreover the United States also presented to this Court on November 10, 1983 a "Plan" that merely reiterated the United States' arguments against providing funds, and that made clear the Executive Branch did not intend either to remedy or alter its pattern of non-compliance with the Consent Decree. That represented a willful flouting of Opinion III and the Court of Appeals' invitation "to fashion [the United States'] proposed remedy for past non-compliance, as well as ... to show that it intends to comply in the future ...."

4. Since the entry of Opinion IV, the United States has taken no steps to find and provide federal funding for Board's Desegregation Plan (the "Plan"). Instead, on June 26, 1984 the United States filed with this Court a "Report" that again repeats its arguments against providing federal funding for the Plan, many of which have already been rejected by the Court of Appeals. That "Report" again demonstrates forcefully that the United States does not intend either to remedy or to alter its pattern of non-compliance with the Consent Decree. Additional reasons for this Court's now granting declaratory and permanent injunctive relief are detailed in Opinion IV.

5. This Court determines that since Opinion II the United States has again persistently violated the Consent Decree and, in particular, has wilfully and intentionally taken actions specifically designed to render funds *un* available for provision to Board. In direct violation of the decisions in Opinion II affirmed by the Court of Appeals in Opinion III, and in direct contravention of the predicate for Opinion III's granting a further opportunity to the United States, the Executive Branch has wholly failed to make the good faith efforts to find and provide funds required by Section 15.1, but has instead consistently acted in bad faith, seeking to deny funding to Board and to undermine the ability of the United States to comply with Section 15.1.

6. Based upon the determinations in Paragraphs 3–5, it is now appropriate for this Court: (a) to determine the level of expenditure adequate for implementation of the Plan for school year 1984–85, (b) to determine the portion of that amount for which the United States is responsible, and (c) to structure detailed enforcement and remedial injunctive relief necessary to insure that the United States' obligations under Section 15.1 are fulfilled. By this Order this Court does not award damages, or any relief in the nature of damages, to Board. Rather this Order grants only prospective, equitable relief, particularly with respect to the upcoming school year, providing specific injunctive relief to compel the United States to meet its obligations

---

**1.** In accordance with the direction of the Court of Appeals, this Court has verified the availability for provision to the Board of funds appropriated in fiscal years 1983 and 1984 to the Secretary's Discretionary Fund and the Special Programs and Populations Account of the Department of Education. See Findings 401—32 and Conclusions 65—114.

under the Consent Decree.[2] To the extent the relief detailed below goes beyond the specific terms of Section 15.1, such added relief is specifically made necessary by the United States' violations that have deliberately undermined its ability to comply now or in the future with Section 15.1, in turn requiring this Court to fashion further equitable relief to assure that the results contemplated by the Consent Decree are achieved in spite of the United States' intransigent attempts to undermine it. (See Conclusion 127)

7. This Court determines and declares the level of expenditure "adequate for the implementation of the Desegregation Plan," within the meaning of Section 15.1, in school year 1984–85 is $171.631 million. That amount, determined in accordance with Findings 201–72 and 301–76, includes the costs of implementing both the educational components and student assignment aspects of the Plan.[3] This is not a determination that the amount provides for full implementation, or represents the limits of what may be adequate, or that a lesser amount would be constitutionally impermissible. Rather it is a determination that the evidence presented demonstrates $171.631 million is the reasonable cost for school year 1984–85 of Board's Plan implementation programs that have been shown:

(a) to be within the programmatic framework delineated in the Consent Decree and Plan that the United States has agreed to and endorsed and that this Court has previously approved; and

(b) to represent a reasonable exercise of Board's discretion to adopt programs that materially aid the implementation of the Plan and, indeed, to be carefully designed to redress substantially the effects of past segregation and assure successful implementation of the Plan.

8. In accordance with Findings 301–76, this Court determines Board has continued since June 30, 1983 to make every good faith effort to find and provide funds. This Court concludes Board, despite its good faith efforts, cannot under present circumstances provide more than $67.773 million in incremental desegregation expenditures[4] for Plan implementation in school year 1984–85. Accordingly Board's funding obligation under the Consent Decree for school year 1984–85 will be fulfilled if it provides $67.773 million. Board remains obligated to take all steps within its legal authority to attempt to find new external sources of desegregation funding for 1984–85 and for subsequent school years.

9. Considering the level of expenditure adequate for Plan implementation set forth in Paragraph 7, the amount of funds available to Board set forth in Paragraph 8, the amount of funds available and potentially available to the United States, and an equitable allocation of costs among the parties under present circumstances, this Court determines and declares the United States' share of the total amount adequate for implementation of the Plan in school year 1984–85 is $103.858 million.[5]

2. Board's proposed order requested this Court to grant relief in addition to the relief provided in this Order. As discussed in court on August 10, 1984, this Court has taken those proposals under advisement and requested additional memoranda from the parties concerning the propriety of the additional proposed relief. This Court will enter a further remedial order granting whatever additional relief is appropriate promptly after receiving those memoranda.

3. Evidence at the hearing indicates approximately the same amount is expected to be necessary in each of the succeeding school years. As to school years subsequent to 1984–85, the present determination by this Court is intended to provide guidance to the parties for planning

future efforts to provide funding. It is not a final determination; such a determination may require further hearings as those school years approach and Plan implementation progresses. See Paragraph 15.

4. This Court recognizes, as indicated in Findings 313–17, that there are substantial ancillary desegregation expenditures that are not taken into account by the figures in this Order.

5. In this respect the United States has advanced various limiting contentions that have been rejected by this Court. In particular, the obligation of the United States is not predicated upon the prior exhaustion by Board of its general

10. This Court determines and declares the present obligation of the Executive Branch of the United States [6] is to take every step within its legal authority, as detailed in Conclusions 131–43, to find and provide $103.858 million for implementation of the Plan for school year 1984–85.[7]

11. As discussed in Conclusion 160, the Consent Decree is a binding obligation of the United States as such, not of the Executive Branch. Considering the violations of the Consent Decree and subsequent court orders, by which the Executive Branch has persistently and successfully sought to limit the current availability of funds, it is now extremely unlikely the Executive Branch can find and provide $103.858 million through the process referred to in Paragraph 10. Rather the Executive Branch violations have willfully and completely undermined the ability of the United States to comply fully with the Consent Decree through that process and have "poisoned the well." As the parties have stipulated (Finding 110), Section 15.1 creates a general obligation to "be interpreted and applied as appropriate in whatever future circumstances might arise." Today's "circumstances," and particularly the presently-existing limitations, are in large part defined by these continuing egregious violations by the Executive Branch. Interpreting and applying Section 15.1 in light of these present circumstances, particularly considering the need to fashion equitable relief to assure implementation of the Decree despite such violations, this Court further determines the United States has an unconditional obligation to provide Board with $103.858 million for implementation of the Plan in school year 1984–85.[8]

12. Board cannot fully enforce the United States' Consent Decree obligation, nor can it obtain complete relief for the United States' violations, absent receipt of the $103.858 million in time for its use in school year 1984–85. All the evidence presented at the most recent hearings demonstrated that sum had to be received by Board no later than June 30, 1984 to enable Board most effectively to implement its Plan programs in school year 1984–85. It is particularly critical that no less than $20 million be provided by August 22, 1984, to allow Board to continue the desegregation programs initiated during the last school year with funds received pursuant to the Yates Bill, which programs cannot otherwise be

resources, and is not limited by the amount of funds that might have been provided under the ESAA program, which the United States has repealed since entering into the Consent Decree. Nor may the United States' obligation be deemed fulfilled by funds or increase in funds, such as ECIA Chapter 1, that are provided to school districts generally for non-desegregation purposes.

6. For purposes of this Order the Executive Branch of the United States includes, but shall not be limited to, the Department of Education, the Department of Justice, the Office of Management and Budget and any other personnel or agencies of the Executive Branch whose participation is necessary for successful implementation of this Order.

7. This is the fundamental obligation contained in Section 15.1. Even if every aspect of this obligation had not been contained in Section 15.1, each aspect is now independently mandated as a result of the need to remedy the violations of the Consent Decree.

8. Although Board's original Petition in this matter initially requested an order compelling the United States' performance of the process required by Section 15.1, this Court determines and declares the Consent Decree can be enforced against the United States under the present circumstances only by imposing the mandatory duties specified herein. Because of the United States' recalcitrance in failing to initiate the Section 15.1 process, its unremitting repudiation of the Consent Decree obligation, and its subversion of the Section 15.1 process by making appropriated funds unavailable, it is no longer appropriate nor feasible to specify only a process mechanism for providing relief to Board. Under these extraordinary circumstances, this Court's authority to provide additional relief against the United States is derived from Board's request for effective enforcement of this Court's original judgment (the Consent Decree) and this Court's interest in ensuring—indeed its duty to ensure—that its orders and judgments are not flouted by parties to a judicial proceeding. Consequently, this Court is empowered and obligated to effect enforcement of the Consent Decree, a prior judgment and mandate of this Article III court.

funded by Board. Board has represented, and there is no reason to doubt, that if Board does not receive that $20 million, programs serving tens of thousands of children will be terminated, 550–600 teachers and other staff will be discharged and, due to seniority provisions, hundreds of other teacher displacements will occur.

13. Considering that Board needed (and that the United States knew of such need) to receive the funding no later than June 30, 1984, and that the United States has had ample opportunity to undertake the process referred to in Paragraph 10 (and again detailed with respect to future years in Paragraph 15), but has repeatedly refused to do so, this Court now orders and permanently enjoins the United States to take the following actions. Its Executive Branch is directed to undertake the process of taking every step within its legal authority to find and provide funding for school year 1984–85 and future years (of course it retains discretion to provide adequate funding from whatever sources of funding are now or are rendered available). However, considering the matters referred to in Paragraphs 11 and 12; if that process does not result in providing $103.858 million by August 22, 1984, the United States is ordered and permanently enjoined to provide the then-available funds, and as part thereof to take the remedial steps set forth in Paragraphs 14, by August 22, 1984.

14. To the extent the United States refuses or fails to provide to Board on or before August 22, 1984, all of its $103.858 million Consent Decree obligation for implementation of the Plan in school year 1984–85, this Court orders and permanently enjoins the United States, its agents, officers and employees, including the Department of Justice and Attorney General of the United States William French Smith and its other agents, and the Department of Education and its Secretary Terrel Bell and its other agents, pursuant to Fed.R. Civ.P. ("Rule") 65, to undertake the following actions on or before August 22, 1984:

    (a) every step necessary to obligate and provide immediately to Board the $17.0 million in the Secretary's fiscal year 1984 Discretionary Fund that are currently restrained by previous Orders of this Court (solely to permit the Secretary to provide such funds to Board for implementation of its Plan, all prior orders restraining obligation of the $17.0 million in the Secretary's fiscal year 1984 Discretionary Fund are vacated contemporaneously with such provision of funds to Board); and

    (b) every step necessary to obligate and provide immediately to Board $11.775 million of the $24 million allocated to the Title IV subaccount of the Department of Education's Special Programs and Populations Account for fiscal year 1984, which are also currently restrained by previous Orders of this Court (such funds may be used by Board only for implementation of those programs identified in Opinion IV as statutorily eligible for Title IV funding; and solely to permit the Secretary to provide such fiscal year 1984 funds for the Board's Title IV eligible desegregation programs, all prior orders restraining obligation of $11.775 million, only, in the fiscal year 1984 Title IV subaccount of the Special Programs and Populations ("SPP") account are vacated contemporaneously with such provision of funds to Board).

15. To fulfill its obligations under the Consent Decree and this Order for school year 1985–86 and for subsequent school years, the United States must formulate an affirmative program in consultation with Board on or before October 1 of the year preceding each next upcoming school year (for example, October 1, 1984 for school year 1985–86). Each such affirmative program shall identify programs that will materially aid implementation of the Plan in that year, shall state the nature and amount of funding that each of the parties can provide for that year, and shall specifically identify the affirmative steps the United States will undertake in its process of finding and providing funds. Among

the actions to be taken by the United States in formulating and executing such affirmative program in each upcoming school year are the following, to the extent necessary to assure that up to $103.858 million [9] is placed in the escrow account referred to in Paragraph 15(i):

(a) identify any funds appropriated or expected to be appropriated to the Department of Education, the Department of Justice or any other agency, which funds may be provided to Board pursuant to Section 15.1 without further Congressional action (in particular, but not to the exclusion of other federal funding sources, this Court has found such funds may be available in the Salaries and Expenses subaccount, the Office for Civil Rights account and the Gift and Bequest account);

(b) identify all "excess funds," [10] in the Department of Education or any other agency, which funds could be reappropriated through Congressional action to be provided to Board;

(c) identify all pending legislative initiatives that would make desegregation funding available for provision to Board;

(d) identify new legislative initiatives that could be undertaken by United States to provide desegregation assistance to Board (this includes, without limitation, legislation comparable to Section 111 of P.L. 98–107);

(e) recommend to the Congress, and otherwise make every good faith effort to secure the enactment of, all legislation necessary to accomplish the United States' program to find and provide funds for implementation of the Plan in school year 1985–86 and subsequent school years;

(f) oppose any proposed legislation that is specifically designed to decrease the amount of funds that could be provided to Board in school year 1985–86 and subsequent school years;

(g) cooperate with Board to satisfy any administrative requirements and remove any administrative obstacles that might impair providing desegregation funding to Board to the fullest extent consistent with applicable statutes;

(h) identify any steps within the lawful authority of the Department of Education that would encourage the State of Illinois to use for desegregation assistance to the Board its discretionary share of funds provided under Chapter 2 of the Education Consolidation and Improvement Act of 1981 ("ECIA"); and

(i) to the extent funds are or could be made available to the Board for implementation of the Plan in school year 1985–86 and for subsequent school years, provide by November 1 preceding each of those school years, up to $103.858 million[11] into an escrow account established by this Court for the use of Board.[12]

9. This amount is of course subject to modification for subsequent school years if a factual showing indicates a different amount is called for.

10. "Excess funds" include any funds now or subsequently appropriated to an agency for budget accounts that do not include desegregation assistance, which the agency will not expend for the purpose for which they were appropriated, whether or not the agency has determined that it will seek to rescind, allow to lapse or seek to reallocate the funds to other budget accounts. For example, while the Executive Branch is to carry out this step promptly without waiting for the end of the fiscal year, the Executive Branch shall report to the Court on September 15, 1984, identifying any funds that may lapse in any agency account at the end of fiscal year 1984. That same information shall be reported to this Court on September 15 of each succeeding federal fiscal year.

11. As previously indicated, this amount is subject to possible future modifications.

12. Specific terms of the escrow account shall be determined by this Court at the previously set

On or before November 15 of each year preceding the next upcoming school year, United States shall file a report with this Court describing in detail the United States program to find and provide federal funding for implementation of the Plan in that upcoming school year and the steps taken by the United States to effectuate that program.

16. In all events the United States' program referred to in Paragraph 15 shall include, without limitation, the actions described in Paragraph 17.[13]

17. Fiscal year 1983 funds in the amount of $21,188,206, appropriated by Congress to the Department of Education for various non-desegregation purposes, were not obligated or expended at the close of fiscal year 1983, and would have lapsed back to the United States Treasury but for this Court's Order of September 27, 1983. Pursuant to the September 27 Order, lapse of the funds was suspended until further order of this Court. At this time the Executive Branch is directed to take the following actions with respect to such funds:

(a) notify the Congress of the United States that $21,188,206 of fiscal year 1983 non-desegregation assistance funds were unobligated at the close of the fiscal year and would have lapsed but for this Court's Order of September 27, 1983, and that such funds are without competing claim-

ants and may be reappropriated for use in the implementation of the Plan in fiscal year 1985–86; [14]

(b) recommend to the Congress, and otherwise make every good faith effort to secure the enactment of, legislation reappropriating the funds described in Paragraph 17(a); and

(c) if the legislation described in Paragraph 17(b) becomes law, promptly obligate and provide such funds to the escrow described in Paragraph 15.

18. To ensure that the impact of the United States' actions in fulfillment of its obligations under the Consent Decree and this Order is not diluted by other action, the desegregation funding provided by the United States to Board shall supplement and not supplant any other financial assistance provided by the United States to Board. Board shall not be disadvantaged by the United States in the administration of any federal programs by reason of the rights and remedies afforded under the Consent Decree and other court orders in this litigation.

19. To facilitate implementation of this Order, the United States is directed to provide notice of this Order and its contents to each of its agents, officers and employees whose conduct may affect United States compliance with its terms, including Attor-

status hearing to be held on September 7, 1984. This Court requests that the parties submit proposals concerning the procedures governing the terms for this escrow prior to that date. It is intended, and the escrow terms shall specifically provide, that upon determination by this Court that all or some portion of the escrowed funds are necessary to implement the Plan in the upcoming school year, the Secretary of Education shall provide the escrowed funds to Board for that purpose. Until such determination is made, the Secretary shall hold the funds in escrow. Any unused funds shall not lapse and shall continue in the escrow for use by Board in the next succeeding school year for implementation of the Plan, and the amount of the United States' contribution for the next suc-

ceeding school year shall be reduced accordingly.

13. In part the further relief requested by Board, referred to in the footnote to Paragraph 6, includes placing in the escrow account the restrained funds appropriated to the Department of Education's Special Programs and Populations Account, other than those referred to in Paragraph 14. This requested relief is also to be addressed in the memoranda to be submitted by the parties, and will be addressed by the Court promptly thereafter.

14. Contemporaneously with such notification a copy shall be provided to this Court and to counsel for the Board.

ney General William French Smith and his agents, Secretary of Education Terrel Bell and his agents, and Director of the Office of Management and Budget David Stockman and his agents.

20. There is no occasion for the stay of any portion of this Order pending any appeal by the United States. Implementation of this Order is of urgent importance to vindicate the rights of the minority students in Board's schools. As indicated in Paragraph 12, a stay would not only prevent further implementation of the necessary desegregation programs, but would result in the dismantling of programs presently in place, severely disrupting implementation of the Plan. By sharp contrast, the United States will not be disadvantaged by compliance with this Order directing the Executive Branch to fulfill the promises voluntarily made in the Consent Decree. Injury to the Board and its students from delaying the implementation of this Order will be severe and irreparable, and far outweighs any corresponding disadvantage to the United States.

21. Given the nature of the relief granted by this remedial order, coupled with Board's identity as a public body, this Court determines the unlikelihood of damages being sustained by any party who might be wrongfully enjoined or restrained justifies the issuance of this Remedial Order without Board's providing security.

22. This Court sets a hearing for September 7, 1984, at 1:30 p.m. to consider the United States' compliance with this Remedial Order, and to consider the possible additional relief.