In re Application of CITY AND COUNTY OF DENVER acting By and Through Its BOARD OF WATER COMMISSIONERS with Respect to its Water Rights in the Blue and its Tributaries in Summit County, Colorado.

CITY AND COUNTY OF DENVER, acting By and Through Its BOARD OF WATER COMMISSIONERS with Respect to its Water Rights in the Blue and its Tributaries in Summit County, Colorado, Applicant–Appellant,

v.

UNITED STATES of America; Trans Mountain Hydro Corporation; Basalt Water Conservancy District; Breckenridge Ski Area; Copper Mountain Water and Sanitation District; Copper Mountain Incorporated; Exxon Company, USA; Mobil Oil Corporation; Colorado State Engineer; Division Engineer for Water Division No. 5; Colorado Division of Wildlife; Town of Basalt; Town of Collbran; Town of Debeque; Town of Eagle; Town of Palisade; City of Rifle; Public Service Company of Colorado; Oxy USA Inc.; Northern Colorado Water Conservancy District and Municipal Subdistrict, Northern Colorado Water Conservancy District; Oil Shale Corporation; Town of Silverthorne; Upper Eagle Regional Water Authority; Town of Breckenridge; Board of County Commissioners of Summit County, Colorado; Exxon Corporation, Vail Associates, Inc. Vidler Tunnel Water Co.; City of Grand Junction, Colorado; Orchard Mesa Irrigation District; Clifton Water District; Colorado River Water Conservation District; Palisade Irrigation District, a Colorado Corporation; City of Fruita, a Colorado Municipality; the Colorado Water Conservation Board; Grand Valley Irrigation Company; Vail Valley Consolidated Water District; the City of Aurora, Colorado; Middle Park Water Conservancy District; Keystone–Arapahoe Limited Partnership; N. Lee Lacy; The Daniel L. Ritchie Corporation; Grand Valley Water Users Association; Mesa County Irrigation District; Getty Oil Company; Getty Oil Exploration Company; UTE Water Conservancy District; Blue River Valley Ranch Lakes Association; Town of Dillon; the Eagle County Board of County Commissioners; City of Colorado Springs; Dillon Valley District; Beazer Materials and Services, Inc.; Town of Frisco; Union Oil Company of California; Salvation Ditch Company, Town of Gypsum; Harland Adams; Adams Ranch Homeowners Association; Owl Creek Development Corporation; Estate of Diane Smith; Summit County; Avon Metropolitan District; Arrowhead at Vail; Citizens for the Protection of Middle Park Water; Hydrowest; Main Elk Corporation; Jeris A. Danielson; Orlyn Bell; Donald Patton; Diane H. Smith Trust; Mount Powell Ranch Partnership, Parties in Interest–Appellees.

No. 90–1046.

United States Court of Appeals, Tenth Circuit.

June 10, 1991.

Jack F. Ross of Saunders, Snyder, Ross & Dickson, P.C., Denver, Colo. (Wayne D. Williams, Michael L. Walker, and Casey S. Funk, Bd. of Water Com'rs for City and County of Denver, and David E. Bellack of Saunders, Snyder, Ross & Dickson, P.C., Denver, Colo., with him on the briefs), for applicant-appellant.

James S. Lochhead of Leavenworth & Lochhead, Glenwood Springs, Colo., and Robert L. Klarquist, Atty., Dept. of Justice, Environment & Natural Resources Div., Washington, D.C. (Donald H. Hamburg, Gen. Counsel, Colorado River Water Conservation Dist., Glenwood Springs, Colo., Richard B. Stewart, Asst. Atty. Gen., Michael J. Norton, U.S. Atty., John R. Hill, Jr., Atty., Dept. of Justice, Environment & Natural Resources Div., Denver, Colo., and David C. Shilton, Atty., Dept. of Justice, Environment & Natural Resources Div., Washington, D.C., Kenneth Balcomb and Scott Balcomb, Delaney & Balcomb, P.C., Glenwood Springs, Colo., Glenn E. Porzak and Richard A. Johnson, Holme Roberts & Owen, Boulder, Colo., David W. Robbins and Mark J. Wagner, Hill & Robbins, P.C., David A. Bailey, Parcel, Mauro, Hultin & Spaanstra, Denver, Colo., and Gregory L. Johnson and Mark T. Pifher, Anderson, Johnson & Gianunzio, Colorado Springs, Colo., Kevin L. Patrick, P.C., Aspen, Colo., David L. Harrison, James R. Montgomery and James J. DuBois of Moses, Wittemyer, Harrison and Woodruff, Boulder, Colo., Gregory J. Hobbs, Jr. and Bennett W. Raley, of Davis, Graham, & Stubbs, Denver, Colo., Anthony W. Williams and Mark A. Hermundstad of Williams, Turner & Holmes, Grand Junction, Colo., Stanley W. Cazier of Baker, Cazier & McGowan, Granby, Colo., D.J. Dufford of Dufford, Waldeck, Milburn & Krohn, Frederick G. Aldrich of Nelson, Hoskins & Farina, Mark N. Williams, Grand Junction, Colo., with them on the briefs), for parties in interest-appellees.

Before HOLLOWAY, Chief Judge, and SEYMOUR, and ANDERSON, Circuit Judges.

STEPHEN H. ANDERSON, Circuit Judge.

The City and County of Denver appeals a district court order dismissing, without prejudice, its application for adjudication of certain water rights. We affirm.

## BACKGROUND

Denver's appeal is part of a complex dispute that has been in litigation for over 40 years. The controversy centers around

water rights to the Blue River, a tributary of the Colorado River, located on the Western Slope of the Continental Divide in Colorado. In 1937, Congress authorized a multi-million dollar reclamation effort known as the Colorado–Big Thompson Project ("CBT"). Among other things, the CBT involved construction of a reservoir and power plant on the Blue River. This facility, known as Green Mountain Reservoir and Power Plant, was completed in 1942. The purpose of the CBT is set forth in Senate Document No. 80, 75th Cong., 1st Sess. (1937), which reveals that Green Mountain's main purpose is to store replacement water for the Western Slope to compensate for other Colorado River water diverted to the Eastern Slope as part of the CBT. *Id.* at 1. It was also intended, however, to generate hydroelectric power and supply additional water for agricultural and industrial uses on the Western Slope. *Id.* at 3.

The litigation began in 1949, when the United States brought an action in United States District Court for the District of Colorado for a determination of its rights in connection with the CBT, and for a declaratory judgment defining its operational obligations under Senate Document No. 80 with respect to Green Mountain Reservoir. The United States sought to quiet title to water rights in the Blue River against Denver, Colorado Springs, and others. These parties maintained their own claims to Blue River water. Denver claimed the right to divert Blue River water upstream from Green Mountain and transport it to the Eastern Slope to augment its municipal water supply.

On October 12, 1955, the court entered a final judgment and decree ("the Blue River Decree") that incorporated a stipulation executed by the parties. The incorporated stipulation recognized Denver's right to divert Blue River water, subject, however, to the federal government's senior right to fill and utilize Green Mountain Reservoir. Thus, according to the incorporated stipulation, Denver could divert Blue River water if the Secretary of the Interior determined that the diversion would "not adversely affect the ability of Green Mountain Reser-

voir to fulfill its function as set forth in [Senate Document No. 80]...." R. Vol. I, Tab 4 at 31. In return, Denver agreed to deliver to the United States electrical energy "in substantially the same amounts, at approximately the same hours and at substantially the same rates of delivery that would have been generated by the Green Mountain Powerplant had it not been for the diversions...." *Id.* at 32. Denver also agreed to bypass water in quantities sufficient to meet all downstream water rights on the Blue River and the downstream segment of the Colorado River having priorities superior to Denver's. *Id.* at 32–33.

In 1960, the parties returned to court disputing issues related to the pending completion of Denver's Dillon Reservoir, located upstream from Green Mountain Reservoir on the Blue River. At issue was: 1) the effect that Denver's filling Dillon Reservoir had on the operation of Green Mountain Reservoir; and, 2) whether Denver could make replacement releases from its Williams Fork Reservoir in order to satisfy the senior, downstream calls for water that were being filled by the Blue River water Denver wished to use to fill Dillon. In 1964, another consent decree ("the 1964 Decree") was submitted and entered by Judge Arraj, who has continued to preside over this litigation in the district court. The 1964 Decree provided, in pertinent part, that: Denver has no right, title, or interest in Green Mountain Reservoir or the water that the United States is entitled to store there (para. 2); the United States has the right to fill Green Mountain Reservoir each year (para. 3); Denver's right to divert water from the Blue River is subject to the approval of the Secretary of the Interior (para. 4); the right of Denver to make certain replacements or exchanges of Blue River water is subject to the approval of the Secretary (para. 5); and any arrangement for replacement must not impair any right of any beneficiary under Senate Document No. 80 (para. 2). 1964 Decree, R. Vol. I, Tab 9.

The next major dispute arose in 1977, when Denver withheld in Dillon Reservoir

over 28,000 acre-feet of water which was necessary to complete the fill at Green Mountain Reservoir and refused the Secretary of the Interior's requests to release the water. The district court again held that the federal government's right to fill Green Mountain Reservoir was superior to Denver's right to fill Dillon Reservoir and prohibited Denver's diversions of Blue River water until Green Mountain Reservoir is either filled or assured of filling each year. We upheld the decision on appeal. *United States v. Northern Colo. Water Conservancy Dist.*, 608 F.2d 422 (10th Cir.1979).

The current controversy began in 1987 when the City and County of Denver, acting through its Board of Water Commissioners, submitted two water rights applications—labeled by the parties the Change Application and the Exchange Application—seeking additional water rights to the Blue River. The United States, the Colorado State Division of Wildlife, several Colorado water districts, and various interested Western Slope entities ("appellees") filed objections to Denver's applications. The district court granted summary judgment against Denver on its Change Application, and that order is not the subject of this appeal.[1] Denver here appeals the dismissal of its Exchange Application ("the application"), which sought adjudication of Denver's right to exchange water from nine reservoirs to be constructed on the Western Slope for additional Blue River water to be diverted to Denver.

Citing to the Blue River and 1964 Decrees, the district court dismissed the application, without prejudice, on two grounds: 1) Denver had not obtained approval of the Secretary of the Interior for the proposed exchange; and, 2) Denver did not have the water in storage when it proposed the exchange.

## DISCUSSION

■ The parties contest the appropriate standard of review. Several appellees assert that Denver's application sought to modify the Blue River Decree, and that we should, therefore, review the district court's ruling under the abuse of discretion standard. *E.E.O.C. v. Safeway Stores, Inc.*, 611 F.2d 795, 799 (10th Cir.1979), *cert. denied*, 446 U.S. 952, 100 S.Ct. 2918, 64 L.Ed.2d 809 (1980). Although one sentence of Denver's application does request the district court to "modify the terms" of the Blue River Decree,[2] Denver insists that it did not seek modification of the earlier Decrees. We agree. The application as a whole is more accurately characterized as a request that the district court, under its retained jurisdiction,[3] interpret the previous Decrees as permitting its proposed exchanges. At any rate, the district court did not undertake modification analysis. Instead, the district court's ruling is based upon its interpretation of the previous Decrees.

"The construction of a consent decree is a matter of contract interpretation.... However, ... 'the district court's views on interpretation of a consent decree are entitled to deference.'" *Ferrell v. Pierce*, 743 F.2d 454, 461 (7th Cir.1984) (quoting *United States v. City of Chicago*, 717 F.2d 378, 382 (7th Cir.1983)); *see Vertex Distributing, Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885, 892–93 (9th Cir.1982). We will defer to the district court's interpretation so long as it is "reasonable in light of the language and purpose of the decree." *E.E.O.C. v. Safeway Stores, Inc.*, 611 F.2d at 798.

Denver contends that the district court improperly imposed conditions on its right, under the Colorado Constitution, to initiate

---

1. This did not stop one appellee from devoting the greater part of its brief to arguing that the summary judgment should be affirmed. *See* Harland Adams, et al., Answer Brief at 1–5. Unfortunately, much of the briefing on this appeal has been similarly disappointing.

2. Exchange Application, R. Vol. I, Tab 16 at 10.

3. Upon entering the final judgment and decree in 1955 (the Blue River Decree), the district court retained continuing jurisdiction over the consolidated cases involved in the matter. Final Judgment, R. Vol. I, Tab 4 at 13. In 1964, the district court similarly retained continuing jurisdiction "for the purpose of effectuating the objectives" of the Blue River and 1964 Decrees. 1964 Decree, R. Vol. I, Tab 9 at 6.

and adjudicate its proposed exchange rights to the Blue River. To support this contention, Denver relies upon 1) language in the prior agreements among the parties, and 2) principles of Colorado water law. We turn first to the prior agreements—the Blue River Decree, the 1964 Decree, and the 1964 Stipulation—and review the relevant language in those documents.

The Blue River Decree, in paragraph 4(c), states:

This obligation adequately to provide water for the priorities on the Blue River and the Colorado River antedating the respective priority dates of [Denver], may be fulfilled by *replacement storage by and on the Blue River or on the Williams River,* subject nevertheless to the requirement that the parties provide that *the plans for replacement storage will first have been approved by the Secretary of the Interior* or his designated representative.... *The water to be exchanged shall be on hand and in storage when the exchange is proposed.* Any exchange approved shall not relieve said cities from the obligation to deliver electrical energy for the amount of water diverted from the Blue River.

R. Vol. I, Tab 4, at 33 (emphasis added).

This language reveals the central interpretive problem: the Blue River Decree does not discuss the exchange sources Denver proposes in its application. The Decree's language is limited to the Williams Fork and Blue Rivers, and Denver proposes exchanges from nine other Western Slope sources. The question is whether the parties envisioned exchanges from other sources, and, if they did, what conditions would apply to the exchanges.

Although the 1964 Decree recognized the problem, it explicitly left the issue unresolved. The 1964 Decree, in paragraph 5, states:

5. *Without prejudice ... to the question whether Denver or Colorado Springs may make exchanges of other Western Slope water for Blue River water or the right of any signatories to the 1955 stipulation to contest the existence of such right, the right of Denver*

*or Colorado Springs to exchange water lawfully impounded on the Williams Fork River or Blue River, as provided for in paragraph 4(c) of said 1955 stipulation [the Blue River Decree], is subject to the consent of the Secretary of the Interior.* The Secretary will not unreasonably withhold his consent whenever the following conditions exist:

A. The right of the United States to fill Green Mountain Reservoir and to use Green Mountain Reservoir as provided in the documents will not be impaired.

B. The water to be exchanged is on hand when the exchange is proposed.

C. Power replacement is tendered by the cities to the United States as provided in paragraph 4(b) of said 1955 stipulation as implemented by paragraph 6 hereof.

When either city desires such an exchange it will give the Secretary and the Division Engineer of Irrigation Division No. 5, or his successor, written notification thereof, together with its proposal or tender for power replacement. If the Secretary does not notify such city within a period of ten days that his consent is withheld, the Secretary's consent shall be deemed given, and the exchange may proceed forthwith. If consent is withheld, a statement of the reasons shall accompany the notification. The cities and the Secretary shall endeavor to work up procedures which will shorten the ten day interval specified above.

R. Vol. I, Tab 9 at 4–5 (emphasis added).

The only document that discusses exchanges from sources other than the Williams Fork and Blue Rivers is known as the 1964 Stipulation. This agreement was adopted on April 16, 1964, the same day as the 1964 Decree, but did not receive the approval of all of the parties. It was, however, signed by both Denver and the United States.

Although substantially identical to the 1964 Decree, the 1964 Stipulation contains an important difference in paragraph 5's opening language:

5. The right of Denver and Colorado Springs to exchange water lawfully im-

pounded on the Williams Fork River or Blue River, as provided for in paragraph 4(c) of said stipulation [the Blue River Decree], *and to make exchanges of water lawfully impounded at other places on the Western Slope for Blue River water,* is subject to the consent of the Secretary of the Interior. The Secretary will not unreasonably withhold his consent whenever the following conditions exist:

(1) The right of the United States to fill Green Mountain Reservoir and to use Green Mountain Reservoir for decreed purposes will not be impaired;

(2) The water to be exchanged is on hand when the exchange is proposed;

(3) Power replacement is tendered by the cities to the United States as provided in paragraph 4(b) of said stipulation as implemented by Paragraph 6 hereof.

When the cities desire an exchange they will give the Secretary written notification thereof, together with their proposal or tender for power replacement. If the Secretary does not notify the cities within a period of ten days that his consent is withheld, the Secretary's consent shall be deemed given, and the exchange may proceed forthwith. If consent is withheld, a statement of the reasons shall accompany the notification. The cities and Secretary shall endeavor to work up procedures which will shorten the ten day interval specified above.

R. Vol. I, Tab 8 at 5–6 (emphasis added).

In its dismissal of Denver's exchange application, the district court did not analyze whether the Blue River and 1964 Decrees permit Denver to exchange water from sources other than the Williams Fork and Blue Rivers. That issue remains unresolved and we do not purport to answer it here. For the purposes of this appeal, we assume, *arguendo,* as the district court implicitly did, that exchanges from other sources are allowed and then focus, as did the district court, on the conditions that would apply to such exchanges.

■ Although its position apparently evolved during the briefing process, Denver does not now deny that the exchange conditions listed in the Decrees apply to their proposed exchanges.[4] Denver only disputes the district court's conclusion that the agreements require Denver to satisfy the conditions *before* it may adjudicate its exchange rights under state law. Denver asserts that the conditions are merely operational, i.e., that they only apply to the act of performing specific exchanges *after* the adjudication of the state water rights upon which the exchanges depend.

■ Denver's argument is well-taken with respect to the condition that it have the water on hand when it proposes the exchange. Common sense suggests that such a condition is chiefly operational. However, we do not read the district court's holding as requiring Denver to have replacement water on hand before adjudicating its exchange rights. In this regard, the district court stated that the on-hand requirement did "not preclude the Secretary's approval of a plan for exchange if

---

**4.** In its opening brief, Denver asserts that the exchange conditions listed in the Blue River and 1964 Decrees were only intended to apply to exchanges from two sources: the Williams Fork and Blue Rivers. Applicant's Opening Brief at 16–18. In that brief, Denver does not once mention the 1964 Stipulation. In its Reply Brief, however, Denver states that it "fully expected … identically the same terms and conditions as applied to the exercise of exchange rights originally recognized by the Blue River Decree and implemented by the 1964 Consent Decree" to apply to its proposed exchange rights from other sources. Reply Brief at 16. In fact, Denver goes further and claims that it "committed itself to the imposition of all of those ex-change conditions" by citing to the Blue River and 1964 Decrees in its application. *Id.* at 16–17. Then Denver cites to the 1964 Stipulation and contends that it constituted Secretarial consent to the additional exchange sources. *Id.* at 25.

We reject this last assertion. The 1964 Stipulation only provides that any right of Denver to exchange water from other sources is subject to Secretarial consent. As demonstrated in paragraph 5 of the 1964 Decree, adopted the same day, the United States reserved its prerogative, as a signatory to the Blue River Decree, "to contest the existence" of such an exchange right. R. Vol. I, Tab 9 at 4.

the approval is conditioned upon the requirement that the water be on hand at the time of the *actual* exchange." Amended Memorandum Opinion and Order, R. Vol. I, Tab 23 at 12 (emphasis added). Thus, the district court ruled that Denver may apply for state adjudication of its exchange rights even though it does not have the replacement water on hand as long as it has obtained Secretarial consent. We now turn to this more important question whether Denver must obtain Secretarial consent before it applies for state adjudication of its exchange rights.

■ According to Denver, paragraph 5 in the 1964 documents demonstrates that the parties intended the Secretary's consent to be operational—requested only days before an anticipated exchange, and granted if the enumerated conditions are satisfied. We disagree. While the latter part of paragraph 5 in the 1964 agreements does, indeed, describe an operational consent, we do not interpret that provision to mean that Secretarial consent is *only* operational. The first enumerated condition of paragraph 5 hinges Secretarial consent on Green Mountain fulfilling its function. With regard to sources other than the Williams Fork and Blue Rivers, the Secretary's determination whether Green Mountain's function will be impaired involves a calculus broader than the advisability of individual exchanges. The proposed replacement water, for example, may enter the Colorado River system below Green Mountain's intended beneficiaries. Such factors universal to any exchange from another source inform the question whether the Secretary should consent to the exchanges at all, regardless of whether there is sufficient water for an individual exchange.

Moreover, the 1964 documents explicitly state that they were only intended to imple-

ment, not modify or limit the Blue River Decree. *See* 1964 Decree, para. 7, R. Vol. I, Tab 9 at 5; 1964 Stipulation, para. 7, R. Vol. I, Tab 8 at 6. And paragraph 4(c) of the Blue River Decree describes broader Secretarial involvement than mere operational consent. It requires the Secretary to "first" approve the "plans" for replacement storage.

■ Denver also asserts that the language "lawfully impounded" in paragraph 5 of the 1964 Stipulation implies that the parties intended Secretarial consent to follow the adjudication of the state water rights. We do not find this argument persuasive. Denver cites no authority, nor do we find any evidence, to support its assertion that "lawfully impounded" means "having obtained an adjudicated exchange right." [5] Contrary to the logic of Denver's assertion, when the 1964 documents were adopted, Colorado water law apparently did not provide for the adjudication of exchanges.[6] It was only with the 1981 amendments to the Water Right Determination and Administration Act, and in particular Colo.Rev.Stat. § 37–92–302(1)(a), that provisions for judicial approval of such exchanges through the filing of a water rights application were adopted.[7]

We cannot say that the district court's interpretation of the Decrees as requiring Secretarial approval *before* adjudication of the state water right is unreasonable. Any answer to the question whether the parties would have intended the consent to precede statutory adjudication is conjectural, and can only be inferred from the general intentions of the parties regarding the extent of Secretarial involvement over the exchange process. The district court's interpretation is certainly compatible with the history and language of the Blue River Decree and Senate Document No. 80, both

---

**5.** And even if it did mean that, such language would not negate an interpretation that the Secretary must also consent to the "plans" for exchange before the state water rights are adjudicated.

**6.** *See* Colo.Rev.Stat. § 148–6–1, *et seq.* (1963), *repealed and re-enacted* Colo.Rev.Stat. § 37–83–101, *et seq.* (1973).

**7.** It should not be too surprising that the language in the prior agreements does not clearly indicate whether Secretarial consent should precede or follow an adjudicatory process that did not exist at the time the agreements were reached.

of which charge the Secretary with extensive responsibility for the effective administration of Green Mountain. *See, e.g.,* Blue River Decree, Findings of Fact and Conclusions of Law, R. Vol. I, Tab 4 at 29, 31, 48; S.Doc. No. 80, 75th Cong. 1st Sess., "Manner of Operation of Project Facilities and Auxiliary Features," at 2–5.

■ We now turn to Denver's contention that requiring Secretarial consent as a precondition to adjudication of its exchange rights violated Colorado water law. The adjudication of state water rights is governed by the Water Right Determination and Administration Act of 1969, Colo.Rev. Stat. §§ 37–92–101, *et seq.* (1990 Replacement Vol.) ("the Water Right Act"). According to Denver, the adjudication process established by the Water Right Act is the means for determining what conditions (such as Secretarial consent) should attach to an asserted right. Denver alleges that dismissal on the pleadings deprived Denver of its statutory right, under § 37–92–305(3), to propose terms and conditions for its asserted exchange rights that would have obviated any injury to others, and would have required the district court, sitting as a state water judge,[8] to grant Denver conditional exchange rights.

We disagree. The Colorado Supreme Court has addressed and rejected Denver's argument. The case of *Fort Lyon Canal Co. v. Catlin Canal Co.,* 642 P.2d 501 (Colo.1982) (en banc), is almost directly on point. In that case, a water judge dismissed, without prejudice, an application by Fort Lyon and the State of Colorado, a shareholder in Catlin Canal Co., for a change of water rights because the applicants had failed to comply with a Catlin bylaw provision requiring the approval of Catlin's board of directors. The water judge held that director approval was a condition precedent[9] to application for adjudication of the water right.

On appeal, the applicants argued that requiring director approval as a condition precedent to adjudication impermissibly infringed on the jurisdiction of the water judge and violated the statutory adjudication process set forth in the Water Right Act. The Colorado Supreme Court rejected the argument:

> We must determine ... whether a mutual ditch company bylaw purporting to further condition or limit the right to a change in point of diversion can be given effect consistent with allowing full scope to the jurisdiction of the water court.
>
> The concept that the rights incident to water right ownership can be modified by private agreement is not novel.
>
> \*   \*   \*   \*   \*   \*
>
> Although the Water Right Act provides protection against a change in water right that would injuriously affect other vested water rights or decreed conditional water rights, section 37–92–305(3), this is not inconsistent with or frustrated by private agreements contractually limiting an owner's right to a change of water right so long as those limitations are reasonable.... We are reluctant to deny force and effect to private agreements ... where those agreements supplement rather than frustrate the purposes of the Water Right Act.
>
> \*   \*   \*   \*   \*   \*
>
> The instant bylaw ... does not oust the water court of jurisdiction, since the court retains jurisdiction over the statutory change in point of diversion proceed-

---

8. As we noted in *United States v. Northern Colo. Water Conservancy Dist.,* 608 F.2d at 430, federal courts involved in this case sit as Colorado water courts. *See also* the orders of the district court dated August 4, 1977, R. Vol. I, Tab 17, and March 17, 1988, *id.* at Tab 18.

9. Significantly, the disputed bylaw did not describe director approval as a condition precedent to adjudication. In fact, it contained language that Denver would characterize as "operational." The relevant language stated:

> Each stockholder desiring to change the place to which any water he may be entitled shall be delivered, shall make written request therefor to the directors. If, in the opinion of the [directors], such transfer may be made without injury to the canal, the company or other stockholders, such water shall be then delivered to such place or places as requested.

*Fort Lyon Canal Co. v. Catlin Canal Co.,* 642 P.2d at 505.

ing as well as the effect to be accorded private agreements dealing with the proposed change. Nor does the reasonable bylaw at issue here conflict with the purposes of the Water Right Act or unduly interfere with the water court's exercise of its authority pursuant to that statute.

\* \* \* \* \* \*

Finally, should the directors disapprove the requested transfer we consider the question of the appropriateness of that disapproval to involve a "water matter" within the jurisdiction of the water court. Judicial economy would be promoted by permitting any challenge to director disapproval to be presented to the water court in the same proceeding as that in which a request for judicial approval of the director-disapproved change of water right is made.

*Fort Lyon Canal Co. v. Catlin Canal Co.,* 642 P.2d at 506–07, 509 (citations omitted).

In light of the Secretary of the Interior's significant role in operating Green Mountain as trustee for Green Mountain's beneficiaries on the Western Slope, *United States v. Northern Colo. Water Conservancy Dist.,* 608 F.2d at 430, we cannot say that the consent provision is unreasonable. In addition, we agree with the Colorado Supreme Court's assessment that judicial economy is best served by treating the consent provision as a condition precedent to adjudication of the right under the Water Right Act. If, as Denver suggests, its proposed exchanges will not affect Green Mountain's function, and the Secretary nevertheless unreasonably withholds consent, Denver may challenge the Secretary's refusal in the same proceeding in which it files for adjudication of its exchange rights.[10]

We therefore reject Denver's contention that the district court improperly applied conditions to adjudication of its exchange rights under state law. The history and language of the prior agreements among the parties and the requirements of Colorado water law support the district court's

dismissal of Denver's application as premature.

 Denver's final contention is that the dismissal of its application, although nominally without prejudice, deprived it of the priority dates for its claimed exchange rights. *See* the Water Right Act, Colo.Rev. Stat. § 37–92–305(1). We have already held that Denver's application was properly dismissed. The responsibility for any loss of priority lies squarely with Denver for failing to obtain the consent of the Secretary of the Interior before filing its ambitious application.

Accordingly, the ruling of the district court is AFFIRMED.

---

10. Denver would have a claim against the Secretary under paragraph 5 of the 1964 Stipulation, in which the Secretary apparently agreed not to unreasonably withhold consent as long as the enumerated conditions were satisfied.